**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **HARRIET SAVITCH,** | : | |
| | : | |
| **Plaintiff pro se,** | : | **Case No. 07-215** |
| | : | |
| **v.** | : | |
| | : | |
| **MARTIN KIRK, individually and in his official capacity as Code Enforcement Officer of the Department of Land Use of New Castle County, and NEW CASTLE COUNTY,** | : | |
| | : | |
| **Defendants.** | : | |

**DEFENDANTS MARTIN KIRK AND NEW CASTLE COUNTY'S MOTION FOR SUMMARY JUDGMENT**

**Pursuant to Federal Rule of Civil Procedure 56 (b), Defendants Martin Kirk and New Castle County hereby move for summary judgment. The basis for the Defendants' motion is set forth in their opening brief filed herewith.**

Respectfully submitted,

/s/ Harshal Purohit
Harshal Purohit, (No. 4593)
New Castle County Law Department
87 Read's Way
New Castle, DE 19720
(302) 395-5272
Attorney for Defendants, Martin Kirk and New Castle County

DATED: September 6, 2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **HARRIET SAVITCH,** | : | |
| | : | |
| **Plaintiff pro se,** | : | **Case No. 07-215** |
| | : | |
| **vi.** | : | |
| | : | |
| **MARTIN KIRK, individually and in his official capacity as Code Enforcement Officer of the Department of Land Use of New Castle County, and NEW CASTLE COUNTY,** | : | |
| | : | |
| **Defendants.** | : | |

**DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Harshal Purohit, (No. 4593)
New Castle County Law Department
87 Read's Way
New Castle, DE 19720
(302) 395-5272
Attorney for Defendants, Martin Kirk
and New Castle County

DATED: Sept. 6, 2007

# TABLE OF CONTENTS

TABLE OF AUTHORITIES....iii

NATURE AND STAGE OF PROCEEDINGS....1

SUMMARY OF ARGUMENT....2

STATEMENT OF FACTS....4

ARGUMENT....8

I. The Summary Judgment Standard....8

II. Savitch's Claims Against New Castle County and Kirk Are Unfounded....9

A. The Claims Against Kirk In His Official Capacity Should Be Dismissed....9

B. The Claim Brought Pursuant To 42 U.S.C. § 1983 Against The County Must Be Dismissed As It Seeks To Impose Liability Upon The County By Virtue Of *Respondeat Superior*....8

C. Savitch's Claims Against Kirk Pursuant to § 1983 Lack Any Basis and Fail To Demonstrate How Kirk Deprived Her of Any Federally Protected Rights....11

D. Savitch's Tort Claims Against New Castle County and Kirk Fail Under the Delaware Tort Claims Act....15

1. New Castle County and Kirk, in his Official Capacity, Cannot Be Liable For the Alleged Torts Based On The Delaware Tort Claims Act....15

2. Savitch Has Failed To Allege How Kirk Acted with Wanton Negligence or Willful or Malicious Intent and, Therefore, Savitch's Claims of Negligent Infliction of Emotional Distress and Unlawful Detention Fail....16

III. Kirk's Actions Were Reasonable Under the Circumstances and, Therefore, He Is Entitled To Qualified Immunity....18

IV. Savitch's Request for Punitive Damages Against The County and Kirk Must Be Dismissed....21

V. If The Defendant's Motion For Summary Judgment Is Not Granted, Savitch's Complaint Must Be Dismissed As She Has Failed To Join An Indispensable Party as Required By the Federal Rules of Civil Procedure....22

CONCLUSION....23

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Anderson v. Liberty Lobby*, 477 U.S. 242, (1986)....8

*Board of Cty. Commr's of Bryan County v. Brown*, 520 U.S. 397 (1997)....10

*City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1982)....21

*Coleman v. Kaye*, 87 F.3d 1491 (3d Cir. 1996)....21

*Couden v. Duffy*, 446 F.3d 483 (3d. Cir. 2006)....16

*Florida v. Rodriquez*, 469 U.S. 1 (1984)....11

*Foster v. Shropshire*, 375A.2d 458 (Del. 1977)....16

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)....18

*Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300 (3d Cir. 1995)....8

*Kentucky v. Graham*, 473 U.S. 159 (1985)....9

*Leipziger v. Township of Falls*, 2001 WL 111611 (E.D.Pa. 2001)....21

*Malley v. Briggs*, 475 U.S. 335 (1986)....18

*Marchese v. Ulmstead*, 110 F.Supp.2d 361 (E.D.Pa. 2000)....21

*Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)....8

*McKee v. Hart*, 2006 WL 27474 (3d Cir. Jan. 6, 2006)....18

*McLaughlin v. Watson*, 271 F.3d 566 (3d Cir. 2001)....18

*Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658 (1978)....9,10

*Moore v. Tartler*, 986 F. 2d 682 (3d Cir. 1993)....11

*Pennsylvania Coal Ass'n. v. Babbit*, 63 F.3d 231 (3d Cir. 1995)....8

*Ricci v. State Board of Law Examiners*, 569 F.2d 782 (3d. Cir. 1978)......................22

*Saucier v. Katz*, 533 U.S. 194 (2001)...........................................................18

*United States v. Mendenhall*, 446 U.S. 544 (1980) ..........................................11

| **Statutes & Other Authorities** | **Page(s)** |
| --- | --- |

U.S. Const. Amend. IV ..... 11

42 U.S.C. § 1983 ..... 9, 10, 11, 21

Fed. R. Civ. P. 19 ..... 22

10 *Del. C.* § 4011 ..... 15, 16

16 *Del. C.* § 5023 ..... 14

## NATURE AND STAGE OF THE PROCEEDINGS

On April 20, 2007, Plaintiff, Harriet Savitch ("Savitch"), commenced this action by filing a complaint in which she asserted three claims arising from the Office of Code Enforcement's inspection of her property on April 22, 2005.  On August 20, 2007, Defendants, Martin Kirk ("Kirk") and New Castle County, were served with a copy of Savitch's complaint.  This is the Defendants' opening brief in support of their Motion for Summary Judgment.

**SUMMARY OF ARGUMENT**

1. Defendant Kirk is entitled to summary judgment because the claims against him in his official capacity are duplicative of the municipal liability claims against New Castle County.

2. Defendant, New Castle County, is entitled to summary judgment because Savitch's claim pursuant to 42 U.S.C. § 1983, based on a *respondeat superior* theory, fails to allege any facts which demonstrate that that an official policy or custom caused her injury.

3. Defendant Kirk is entitled to summary judgment because Savitch has failed to demonstrate how Kirk placed her in custody, seized her, or deprived her of any federally protected right.

4. Defendants Kirk and New Castle County are entitled to summary judgment on Savitch's tort claims because Savitch has failed to demonstrate any facts which show that New Castle County or Kirk do not enjoy protection under the Delaware Tort Claims Act.

5. Defendant Kirk is entitled to summary judgment because Kirk's actions were reasonable under the circumstances, even if they occurred as alleged, and, therefore, Kirk enjoys qualified immunity from all liability.

6. Defendants New Castle County and Kirk are entitled to summary judgment on Savitch's claims for punitive damages because punitive damages are not available against municipalities or municipal officials. In addition, Savitch cannot demonstrate that Kirk's individual actions were motivated by evil intent or reckless indifference to Savitch's rights.

7.    Even if the Defendants' Motion for Summary Judgment is denied, Savitch's

Complaint should be dismissed as she has failed to join an indispensable party as

required by the Federal Rules of Civil Procedure.

## STATEMENT OF FACTS

### I. The Parties

In April of 2005, Savitch owned and resided at the property located at 16 Woodbrook Circle, Wilmington, DE 19810. At that time and through this day, Kirk is the Community Governing Administrator for the Department of Land Use. As the Community Governing Administrator, Kirk assists the Office of Code Enforcement in supervising inspections of various problem properties throughout New Castle County, including Savitch's property.

### II. Prior To The April 22, 2005 Inspection

Prior to 2004, Code Enforcement Officer Gregory Solomon ("Officer Solomon") was assigned to the area of New Castle County where Savitch's property is located. In March of 2004, Officer Solomon notified Savitch of the various property maintenance violations on her property. However, Savitch failed to bring the property into compliance with the New Castle County Code.

During one of Officer Solomon's inspections, Savitch indicated that she was unable to exit her residence through any of the doors because her property was filled with debris, trash, and household items. It was Officer Solomon's understanding that Savitch collected items and stored them inside her home. Savitch also indicated that her only means of egress from her residence was through a bedroom window in the front of her property. The conditions on Savitch's property continued to deteriorate, and in April of 2005, Officer Solomon became extremely concerned for Savitch's health, safety and welfare.

Officer Solomon notified Kirk about the deteriorating conditions at Savitch's property, including Savitch's limited means of egress. Kirk and Solomon were concerned that Savitch

may possibly have a hoarding disorder since Savitch had admitted on several occasions that she stored trash and debris in her residence. Kirk suggested that the Office of Code Enforcement contact Mobile Crisis Intervention ("Mobile Crisis"), an agency that assists individuals who may have mental health crises. Prior to April 22, 2005, Kirk followed the customary procedure for inspecting problem properties by contacting the New Castle County Police Department and requesting that a police officer assist the Office of Code Enforcement in executing a search warrant at Savitch's property. Affidavit of Martin Kirk ("Kirk Aff.") Ex. A.). In addition, Kirk contacted Mobile Crisis and requested that the Mobile Crisis staff meet at Savitch's property on April 22, 2005 to speak with Savitch.

**III. April 22, 2005 Inspection**

On the morning of April 22, 2005, Officer Solomon obtained a search warrant to inspect Savitch's property. ("Kirk Aff.") Ex. B.). After obtaining the search warrant, Kirk, Officer Solomon, and New Castle County Police Officers Burton and Babinger met at Savitch's property. In addition, two staff members and a doctor, Dr. Cuba, from Mobile Crisis arrived at Savitch's property. Kirk knocked on the front bedroom window of Savitch's property, and notified Savitch that staff members from Mobile Crisis, including a doctor, would like to speak to her. Kirk and Officers Solomon, Burton and Babinger moved away from the front bedroom window and conducted an exterior inspection of Savitch's property while the staff members from Mobile Crisis spoke with Savitch. Kirk was unaware of the nature of the conversation that took place between Dr. Cuba and Savitch.

When Kirk returned to the front of Savitch's property, Savitch had exited her home through the front window and was standing in front of her property. Kirk and Officer Solomon approached Savitch and explained that the Office of Code Enforcement had obtained a search

warrant to inspect her property because of the unsafe and uninhabitable condition of her property. A copy of the search warrant was posted on Savitch's front door. Savitch was responsive and did not verbalize any concerns regarding the search warrant.

At that point, Kirk was told by the Mobile Crisis staff that Savitch was being taken in for evaluation and within a few minutes an ambulance arrived to transport Savitch. Kirk had no knowledge of the conversation that took place between Savitch and the Mobile Crisis staff members that led to the request for an ambulance. Savitch's only request during this time period was that she be able to retrieve her walker from inside the property prior to leaving. Kirk notified Savitch that although it would be unsafe for her to reenter the property through the window, he could enter the property to retrieve the walker for her. However, the Mobile Crisis staff indicated that ambulance staff would be able to assist Savitch in transporting her and she would not need her walker.

Kirk observed that Savitch was satisfied with the Mobile Crisis staff member's response, and he did not enter the property to retrieve Savitch's walker. Kirk also observed that Savitch voluntarily sat on the ambulance stretcher. Savitch made no verbal or physical communication to indicate that she was involuntarily being transported to a hospital. Kirk understood that the ambulance was taking Savitch and Dr. Cuba to the hospital, while the Mobile Crisis staff followed. Kirk and Officers Solomon, Burton and Babinger continued to inspect the interior and exterior of Savitch's property.

The inspection of Savitch's property revealed uninhabitable conditions, including three feet of trash and debris in every room in the home, the lack of water or sanitary facilities, and a ceiling and roof that were in serious disrepair. (Kirk Aff. Ex. C.). As a result, the property was posted by Officer Solomon as Unfit for Human Habitation. (Kirk Aff. Ex. D.). On April 25,

2005, the Office of Code Enforcement retained the services of a vendor to secure the property to prevent any intruders from unlawfully entering the property.

## ARGUMENT

### I.     The Summary Judgment Standard.

The standard of review to be applied on a motion for summary judgment is well established.  Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986). "Facts that could alter the outcome are 'material' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (citations omitted).

Once the moving party has demonstrated an absence of material fact, the burden shifts to the nonmoving party who "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (*quoting* Fed. R. Civ. P. 56(e)). The court should view "the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n. v. Babbit*, 63 F.3d 231, 236 (3d Cir. 1995).  However, the mere existence of a scintilla of evidence in support of the non-moving party will not prevent the grant of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-moving party on that issue. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).  Mere speculation or conjecture by the non-moving party clearly cannot preclude the granting of summary judgment.

## II. Savitch's Claims Against New Castle County and Kirk Are Unfounded.

Savitch's Complaint states that this action was brought pursuant to 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments. Compl. ¶ 12. Savitch's Complaint also alleges that Kirk negligently caused Savitch mental anguish and emotional distress by unlawfully detaining her Compl. ¶ 21 and 23. Finally, Savitch alleges that New Castle County is vicariously liable for Kirk's actions. Compl. ¶ 20 and 24. A close examination of the allegations in the Complaint and the incontrovertible facts of the case demonstrate that summary judgment in favor of Kirk and New Castle County is warranted on all counts.

### A. The Claims Against Kirk In His Official Capacity Should Be Dismissed.

As an initial matter, Plaintiff has brought suit against Defendant Kirk in his individual and official capacity. The official capacity claims against Kirk are duplicative of the municipal liability claims asserted against the County, as suits against government officials in their official capacities are equivalent to suits against the government entity itself. *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658, 690 n. 55 (1978). *See also Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("official capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent."). Therefore, the allegations against Kirk in his official capacity should be dismissed.

### B. The Claim Brought Pursuant To 42 U.S.C. § 1983 Against The County Must Be Dismissed As It Seeks To Impose Liability Upon The County By Virtue Of *Respondeat Superior*.

Plaintiff's Complaint alleges that the County should be liable under 42 U.S.C. § 1983 for the alleged constitutional torts of its employee, Kirk. (*See generally Complaint*) In fact, when describing the parties, Plaintiff simply refers to the County's status as a governmental entity. *Complaint* ¶ 3.

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State. . ., subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.

42 U.S.C. § 1983.  A municipality such as New Castle County, however, cannot be held liable under § 1983 on *respondeat superior* theories for the alleged unconstitutional acts of its employees. *Monell*, 436 U.S. at 694.  Rather, a municipality can only be held responsible when an official policy or custom of the municipality itself, whether made by lawmakers or those whose acts can fairly be said to represent official policy, causes a Plaintiff's injury.  *Id.*

The Supreme Court has reaffirmed that "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of the employee." *Board of Cty. Commr's of Bryan County v. Brown*, 520 U.S. 397, 405 (1997).  "[A] plaintiff must show that the municipal action was taken with a requisite degree of culpability, and must demonstrate a direct casual link between the municipal action and the deprivation of federal rights." *Id.* at 403.

Savitch's Complaint simply asserts that Kirk violated her right to be free from unlawful seizure and unlawful detention. *See Complaint generally* and ¶ 15, 23.  Savitch is unable to point to any official County policies or customs that caused any injury to her.   Without more and only sheer speculation, New Castle County cannot be liable.

### C. Savitch's Claims Against Kirk Pursuant To § 1983 Lack Any Basis and Fail To Demonstrate How Kirk Deprived Her of Federally Protected Rights.

In order to assert a claim under § 1983, the Plaintiff must show: (1) the conduct complained of was committed by a state actor, and the (2) conduct deprived the plaintiff of a federally protected right. *Moore v. Tartler*, 986 F. 2d 682, 685 (3d Cir. 1993). In this case, Plaintiff alleges that Kirk violated her rights as guaranteed by the Fourteenth and Fourth Amendments of the United States Constitution. Compl. ¶ 12.

The Fourth Amendment guarantees "[t]he right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures…" U.S. Const. Amend. IV. In determining whether a seizure occurred the United States Supreme Court has held that a Fourth Amendment seizure occurs "only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). "[I]n view of all circumstances surrounding the incident, a reasonable person would have [to] believ[e] that he was not free to leave." *Mendenhall*, 446 U.S. at 554 (1980). Factors to consider in making a reasonable person inquiry include: "the threatening presence of several police officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.*

Although the Supreme Court has identified several factors in the reasonable person inquiry that may implicate a seizure under the Fourth Amendment, the Court has also clearly identified that contact in which an officer identifies himself and simply asks an individual to speak with him does not implicate a Fourth Amendment interest. *Florida v. Rodriquez*, 469 U.S. 1, 5 (1984).

Savitch's Fourth Amendment interests were not implicated by Kirk's actions because a reasonable person in Savitch's circumstances would not have believed that she was being seized. On April 22, 2005, Kirk had two brief interactions with Savitch. Kirk's first interaction with Savitch occurred when he entered Savitch's property and knocked on the front bedroom window, the bedroom that Savitch was known to occupy. Savitch was familiar with both Officer Solomon, who had conducted inspections of Savitch's property since 2004, and Kirk and could not have felt threatened by their presence on her property.

When Savitch approached the window, Kirk notified Savitch that the Mobile Crisis doctor and staff members would like to speak with her. In order to eliminate any possibility of any intimidation, Kirk and Officers Solomon, Burton and Babinger inspected the rear of the property while Savitch spoke with the Mobile Crisis staff. Savitch was never forced to speak with the doctor or the staff members. She was never threatened either verbally or physically by Kirk or any of the officers. The officers did not display their weapons or make a show of any authority requiring Savitch to speak with Dr. Cuba. Savitch had the ability to stop all conversation with the Mobile Crisis staff, however she choose to continue speaking with Dr. Cuba. As identified in *Florida v. Rodriquez*, by simply requesting that Savitch speak with Kirk or the Mobile Crisis staff, Kirk did not implicate Savitch's Fourth Amendment rights.

When Kirk returned to the front of the property Savitch had exited her residence through the front window and was standing with the Mobile Crisis staff. Kirk had no involvement with Savitch exiting her home, and he was simply told that Savitch climbed out of the window. Savitch never indicated that she was forced to come out of her property or that she wished to return inside her property. Therefore, Savitch could not have reasonably felt that she was being seized.

Kirk's second interaction with Savitch occurred when Kirk and Officer Solomon notified Savitch that the Office of Code Enforcement had obtained a search warrant to conduct an inspection of both the interior and exterior of Savitch's property. Savitch did not express any concerns regarding the search warrant. The tone of voice and language used by Kirk and Officer Solomon was not intimidating or threatening. If anything, Kirk and Officer Solomon continued to express concern for Savitch's health, safety and welfare. Officer Solomon and Kirk had no reason to threaten Savitch on her property as they had obtained a search warrant earlier that morning to lawfully enter Savitch's property with or without her consent.

It was the Mobile Crisis staff that notified Kirk that that Savitch was being transported by ambulance to a hospital for an evaluation. Kirk was unaware of the circumstances that led up to the request for an ambulance by Mobile Crisis. Savitch's only request during this time period was that she wanted to retrieve her walker. Kirk offered to retrieve Savitch's walker from the property as it was unsafe for Savitch to return inside on her own. However, the staff from Mobile Crisis notified Savitch that she would not need her walker, and the ambulance staff would be able to transport Savitch without one. Savitch did not express any concern, either verbally or physically, and she voluntarily sat down on the stretcher. Savitch did not any point present an unwillingness to go to the hospital for an evaluation. In looking at the totality of circumstances, a reasonable person would not believe that she was being placed under custody or being seized.

After the ambulance, Savitch, and the Mobile Crisis staff members left Savitch's property and Kirk, and Officers Solomon, Burton, and Babinger continued to inspect Savitch's property. Kirk did not have any additional contact with Savitch on that day.

Although Savitch's Complaint states that Kirk requested police presence and the doctor to ensure Savitch's custody, these allegations are based on mere speculation. It is customary for a Code Enforcement officer or supervisor to request police presence when executing a search warrant and inspecting the interior of a property. Further, Kirk's only request was that the Mobile Crisis staff speak with Savitch to determine if she needed assistance. He never made any promises or threats to Savitch that would influence Savitch's decision to either exit her property or go to the hospital for an evaluation. Kirk never placed or directed anyone to place Savitch in custody. Savitch was never restrained, handcuffed, or physically touched. Savitch simply cannot point to any facts which would reasonably demonstrate that she was intimidated by Kirk or anyone else.

As a Community Governing Administrator, Kirk did not have any actual or apparent authority to demand that Mobile Crisis take Savitch into custody. Kirk is not a doctor or psychiatrist and as a matter of law he does not have any actual or apparent authority to admit a patient to a hospital or require her involuntary commitment. 16 *Del. C.* § 5023 outlines the procedure for the involuntary admission of a patient to a hospital. This section specifically states that a person can only be involuntarily admitted to a hospital pursuant to a written certification provided by a psychiatrist who has conducted a psychiatric evaluation. 16 *Del. C.* § 5023. See also 16 *Del. C.* § 5023 (identifying the procedure for the emergency apprehension of the dangerous mentally ill and requiring a doctor's certification for admission.)

Savitch's allegation that Kirk directed Dr. Cuba, Wilmington, Hospital or St. Jones Behavioral Health Center to conduct a psychological evaluation on her and involuntarily admit her is unsupported and based on speculation. Kirk does not have the ability to order a psychological evaluation on any property owner. Kirk would not have the ability to order Dr.

Cuba, a doctor licensed in the State of Delaware, to involuntarily admit Savitch or order a psychological evaluation. To allege that both Wilmington Hospital and St. Jones Behavioral Health Center would have involuntarily admitted Savitch at Kirk's direction is simply false.

Even in looking at the facts in a light most favorable to the plaintiff, Savitch cannot point to any reasonable facts that would demonstrate that Kirk infringed on her Fourth Amendment right to be free from unlawful seizure. Therefore Savitch's claim based on §1983 is baseless. Accordingly, summary judgment in favor of Kirk is appropriate.

**D.      Savitch's Tort Claims Against New Castle County and Kirk Fail Under The Delaware Tort Claims Act.**

Savitch's Complaint also alleges that Kirk breached a duty of care owed to her by acting grossly negligent and recklessly when unlawfully seizing and unlawfully detaining her. In addition, Savitch claims that New Castle County should be held liable for Kirk's actions because the County is vicariously liable for the actions of its agents, servants, and/or employees.

**1. New Castle County and Kirk, In His Official Capacity, Cannot Be Liable For Alleged Torts Based On The Delaware Tort Claims Act.**

The Delaware Tort Claims Act states that "[e]xcept as otherwise expressly provided by statute, all governmental entities and their employees shall be immune from suit on any and all tort claims seeking recovery of damages" 10 *Del. C.* § 4011.

Even if facts occurred exactly as Savitch alleges, Savitch has failed to demonstrate why New Castle County and Kirk, in his official capacity, fail to fall under the protections of the Tort Claims Act. Therefore, Defendants New Castle County and Kirk should be awarded summary judgment on Savitch's tort claims.

**2. Savitch Has Failed To Allege How Kirk Acted With Wanton Negligence or Willful or Malicious Intent and, Therefore, Savitch's Claims of Negligent Infliction of Emotional Distress and Unlawful Detention Fail.**

As discussed earlier, a reasonable person could not have believed that Savitch was in custody during the two brief interactions that Kirk had with Savitch. However, even if it is determined that Savitch was seized, Kirk did not act with wanton negligence or willful or malicious intent.

The Delaware Tort Claims Act states:

> An employee may be personally liable for acts or omissions causing property damage, bodily injury or death in instances in which the governmental entity is immune, but only for those acts which were not within the scope of employment or which were performed with wanton negligence or willful and malicious intent.

10 *Del. C.* § 4011. Case law in Delaware has interpreted conduct as "wanton" "only where it reflects a 'conscious indifference' or an 'I-don't-care attitude." *Couden v. Duffy*, 446 F.3d 483 (3d. Cir. 2006) *citing Foster v. Shropshire*, 375A.2d 458, 461 (Del. 1977).

In this case, Savitch does not allege any facts which reasonably demonstrate that Kirk acted outside the scope of his employment or that he acted with wanton negligence or willful or malicious intent. Savitch's Complaint alleges that Kirk breached the duty of care that he owed her, unlawfully detained her by directing her unlawful seizure, took her into custody and had her involuntarily committed to a hospital. *See Complaint* generally. As previously mentioned, Kirk had two brief interactions with Savitch on April 22, 2005. During the first interaction, Kirk simply identified himself and notified Savitch that the Mobile Crisis would like to speak with her. Kirk was not a party to the conversations that led Savitch to exit her property through her window. The second interaction that Kirk had with Harriet was while Officer Solomon presented Savitch with the search warrant.

Kirk's actions were in good faith and he did not unlawfully detain Savitch or breach any duty of care owed to her.  Savitch was not forced to answer any questions nor was she taken anywhere against her will.  Kirk did not make any promises or threats to encourage Savitch to exit her property or sit on the ambulance stretcher.  In fact, Kirk was not involved in Savitch's exit from her property, the request for an ambulance or Savitch's commitment.  Kirk did not have the apparent or actual authority to commit Savitch to any hospital, and Savitch's statement that states that he directed Savitch's commitment is baseless.

Savitch is unable to point to any conduct which demonstrated that Kirk acted outside the scope of his employment or that he acted with wanton negligence or willful or malicious intent. Therefore, Kirk cannot be held personally liable pursuant to 10 *Del. C.* § 4011.

**III. Kirk's Actions Were Reasonable Under The Circumstances and, Therefore, He Is Entitled To Qualified Immunity.**

If Kirk's actions are construed as causing Savitch to seized, Kirk's actions to the extent they occurred as alleged were objectively reasonable under the circumstances of which Kirk was aware, and he enjoys qualified immunity from all liability therefor. As the Supreme Court remarked in its early decisions when crafting the doctrine, the purpose of the qualified immunity defense is to provide government officials "some degree of immunity to avoid unacceptable interference with their duties and the hindrances possibly associated with threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). Qualified immunity provides protection to all but the plainly incompetent or those who knowingly violate the law. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

As most recently enunciated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), there is a two-part test for qualified immunity. First, a court must determine whether the facts, when taken in a light most favorable to the plaintiff, are sufficient to show that the individual defendant violated a constitutional right; second, even if a constitutional violation can be made out, nonetheless the immunity still protects individual defendants unless the right allegedly violated was "clearly established" at the time the defendant acted, such that a reasonable official would have known it. *Id.*

A right is "clearly established" if its "contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *McKee v. Hart*, 2006 WL 27474, at *5 (3d Cir. Jan. 6, 2006) (quoting *McLaughlin v. Watson*, 271 F.3d 566, 571 (3d Cir. 2001)). In other words "there must be sufficient precedent at the time of the action, factually

similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." *Id.* (citation omitted).

Savitch's claim fails the first part of the *Saucier* test. As discussed *supra*, Savitch has neither pled nor developed a *prima facie* case that the Kirk violated her constitutional rights. In this case, Kirk entered Savitch's property on the basis of a search warrant obtained by Officer Solomon. He knocked on her window and notified her that the staff members from Mobile Crisis would like to speak with her. He did not have any further interaction with Savitch until he stood beside Officer Solomon as Savitch was presented with the search warrant. Kirk and Officer Solomon explained that Code Enforcement had obtained a search warrant to inspect Savitch's property. Kirk also offered to retrieve Savitch's walker from the property when she requested it.

Kirk did not request an ambulance nor did he demand that Savitch sit on the ambulance stretcher. Kirk did not arrest Savitch or place her is custody. As a matter of law, Kirk would not have been able to involuntarily commit Savitch to a hospital or order her admission for a psychological evaluation. Kirk's actions did not amount to a seizure or unlawful detention and, therefore, Savitch's constitutional rights were not violated. As such, Savitch has failed the first inquiry under *Saucier.*

However, assuming *arguendo* that the Savitch did present a *prima facie* claim under prong one of *Saucier* against Kirk, qualified immunity must still be granted based upon prong two of *Saucier,* which requires that the actions of the individual defendants must have violated a "clearly established" constitutional right of the Plaintiff. Savitch has also failed to present any facts which would demonstrate that Kirk violated a clearly established right that a reasonable official would have known about. In the instant case, there was insufficient precedent at the time

that would have put Kirk on notice that his alleged conduct was constitutionally prohibited. Kirk could not have reasonably known or believed that by speaking with Savitch and notifying her that Mobile Crisis staff would like to speak with her he could potentially be seizing Savitch or detaining her. Kirk's actions were reasonable under the circumstance and as a result, he enjoys qualified immunity from all liability therefor. Accordingly, Defendants are entitled to summary judgment on the Complaint.

## IV. Savitch's Request For Punitive Damages Against The County And Kirk Must Be Dismissed.

To the extent that Plaintiff seeks punitive damages against the County for alleged violations of § 1983, a municipality cannot be held liable for a claim for punitive damages brought under § 1983. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1982); *Marchese v. Ulmstead*, 110 F.Supp.2d 361, 373 (E.D.Pa. 2000). Similarly, punitive damages are not available against municipal officials in their official capacities under § 1983. *See Leipziger v. Township of Falls,* 2001 WL 111611, at *9 (E.D.Pa. 2001). Accordingly, Savitch's claims for punitive damages against the County and Kirk in his official capacity must be dismissed as a matter of law.

Similarly, to the extent that Savitch attempts to assert claims for punitive damages against Kirk in his individual capacity, that claims should also be dismissed. Punitive damages may be awarded under 42 U.S.C. § 1983 "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involved reckless or callous indifference to the federally protected rights of others." *Coleman v. Kaye*, 87 F.3d 1491, 1497 (3d Cir. 1996) (*citation omitted*). However, the facts, even as they are alleged in Savitch's Complaint, do not reflect any evidence that Kirk acted at all with respect to the conduct complained of, or that Kirk acted with any reckless or evil motive or intent sufficient to enable a jury to award punitive damages. Therefore, this claim must be dismissed.

## V. If The Defendant's Motion For Summary Judgment Is Not Granted, Savitch's Complaint Must Be Dismissed As She Has Failed To Join An Indispensable Party as Required By the Federal Rules of Civil Procedure.

Federal Civil Procedure Rule 19 states:

> Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

Fed. R. Civ. P. 19. *See also Ricci v. State Board of Law Examiners*, 569 F.2d 782 (3d. Cir. 1978) (holding that although the district court should not have granted summary judgment for the plaintiff's failure to join an indispensable party, the court could have entered an order dismissing the complaint on that ground.)

In this case, Savitch claims that she was placed under custody, seized, and involuntarily admitted to a hospital. If the facts occurred as Savitch alleges, Savitch has failed to join an indispensable party to this suit. Therefore, Savitch's Complaint should be dismissed.

## CONCLUSION

For the aforementioned reasons, New Castle County, and Defendant Martin Kirk, in his individual and official capacities, respectfully request that Savitch's claims against them be dismissed.

Respectfully submitted,

/s/ Harshal Purohit
Harshal Purohit, Assistant County Attorney (#4593)
New Castle County Law Department
87 Reads Way
New Castle, DE 19720
(302) 395-5272
*Attorney for New Castle County and Martin Kirk*

Dated: September 5, 2007

**H**

McKee v. Hart
C.A.3 (Pa.),2006.

United States Court of Appeals,Third Circuit.
Dwight L. MCKEE; Allen L. Jones
v.
Henry HART; Wesley Rish; Albert Masland; James Sheehan; Daniel P. Sattelle Daniel P. Sattele, Appellant.
**No. 04-1442.**

Argued March 10, 2005.
Jan. 6, 2006.

**Background:** Investigator for the state office of inspector general sued supervisor under § 1983 alleging supervisor had retaliated against him for his refusal to stop voicing his concerns about the pharmaceutical industry, in violation of the First Amendment. The United States District Court for the Middle District of Pennsylvania, 2004 WL 1454108,Richard Caputo, J., denied supervisor's motion for summary judgment on qualified immunity basis, and appeal was taken.

**Holdings:** The Court of Appeals, Ambro, Circuit Judge, held that:

(1) supervisor's allegedly retaliatory comments to employee did not rise to level of retaliatory harassment under First Amendment, and

(2) even if supervisor violated employee's First Amendment rights, such rights were not clearly established at time of alleged conduct.

Reversed and remanded.

West Headnotes

**[1] Federal Courts 170B 754.1**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)1 In General
170Bk754 Review Dependent on Whether Questions Are of Law or of Fact
170Bk754.1 k. In General. Most Cited Cases

An appellate court exercises plenary review over a district court's conclusions of law in its qualified immunity analysis.

**[2] Federal Courts 170B 763.1**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)1 In General
170Bk763 Extent of Review Dependent on Nature of Decision Appealed from
170Bk763.1 k. In General. Most Cited Cases

In reviewing a district court's qualified immunity analysis, an appellate court may review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right, but may not consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove.

**[3] Civil Rights 78 1376(2)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

Qualified immunity insulates government officials performing discretionary functions from suit insofar as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.

**[4] Civil Rights 78 1376(1)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(1) k. In General. Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Civil Rights 78 ⚷1376(2)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

To determine whether an official has lost his or her qualified immunity, a court must first decide whether a constitutional right would have been violated on the facts alleged, and if the answer to that question is " yes," the court must then consider whether the right was clearly established.

**[5] Constitutional Law 92 ⚷1929**

92 Constitutional Law
92XVIII Freedom of Speech, Expression, and Press
92XVIII(P) Public Employees and Officials
92k1929 k. Public or Private Concern. Most Cited Cases
(Formerly 92k90.1(7.2))

A public employee has a First Amendment constitutional right to speak on matters of public concern without fear of retaliation. U.S.C.A. Const.Amend. 1.

**[6] Constitutional Law 92 ⚷1925**

92 Constitutional Law
92XVIII Freedom of Speech, Expression, and Press
92XVIII(P) Public Employees and Officials
92k1925 k. In General. Most Cited Cases
(Formerly 92k90.1(7.2))

In determining whether a cognizable First Amendment claim has been stated by a public employee, the effect of the alleged conduct on the employee's freedom of speech need not be great in order to be actionable, but it must be more than de minimis. U.S.C.A. Const.Amend. 1.

**[7] Constitutional Law 92 ⚷1940**

92 Constitutional Law
92XVIII Freedom of Speech, Expression, and Press
92XVIII(P) Public Employees and Officials
92k1940 k. Harassment. Most Cited Cases
(Formerly 92k90.1(7.2))

**States 360 ⚷53**

360 States
360II Government and Officers
360k53 k. Appointment or Employment and Tenure of Agents and Employees in General. Most Cited Cases

Supervisor's allegedly retaliatory comments to special investigator for Pennsylvania Office of Inspector General (OIG), including telling him to go with the flow and not permitting him to speak to anyone about investigation into pharmacist without supervisor's permission, did not rise to level of harassment, under First Amendment, in retaliation for his speaking out about pharmaceutical industry; comments were aimed at getting investigator to focus on investigation to which he was assigned instead of focusing on his own wide-ranging concerns about pharmaceutical industry as a whole, and investigator suffered no alteration in his employment benefits, pay, or job classification as a result of speaking out about potential corruption in pharmaceutical industry. U.S.C.A. Const.Amend. 1.

**[8] Civil Rights 78 ⚷1376(10)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(10) k. Employment Practices. Most Cited Cases

Supervisor of special investigator for Pennsylvania Office of Inspector General (OIG) was entitled to qualified immunity from investigator's § 1983 claim that supervisor retaliated against him, in violation of First Amendment, for speaking out against pharmaceutical industry, since constitutional right allegedly violated was not clearly established; reasonable official in supervisor's position would not have been aware that making a few comments over the course of a few months, the gist of which was asking an employee to focus on his job, could violate First Amendment. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

436 F.3d 165
Page 3
436 F.3d 165, 152 Lab.Cas. P 60,134, 23 IER Cases 1527
**(Cite as: 436 F.3d 165)**

**[9] Constitutional Law 92 1940**

92 Constitutional Law
92XVIII Freedom of Speech, Expression, and Press
92XVIII(P) Public Employees and Officials
92k1940 k. Harassment. Most Cited Cases
(Formerly 92k90.1(7.2))

A public employee states a First Amendment claim by alleging that his or her employer engaged in a campaign of retaliatory harassment in response to the employee's speech on a matter of public concern, even if the employee could not prove a causal connection between the retaliation and an adverse employment action. U.S.C.A. Const.Amend. 1.

***166** Charles W. Rubendall, II, (Argued), Donald M. Lewis, III, Keefer, Wood, Allen & Rahal, LLP, Harrisburg, PA, for Appellant.
Donald A. Bailey, (Argued), Bailey Stretton & Ostrowski, Harrisburg, PA, for Appellee.

Before SCIRICA, Chief Judge, ROTH and AMBRO, Circuit Judges.

OPINION OF THE COURT

AMBRO, Circuit Judge.

Daniel Sattele appeals the District Court's denial of his summary judgment ***167** motion seeking qualified immunity in a suit brought by Allen Jones alleging that Sattele, among others, had retaliated against him for exercising his First Amendment rights. Because Jones did not allege that Sattele deprived him of a constitutional right-and because even if he had, that right was not clearly established at the time Sattele engaged in the alleged conduct-we conclude that Sattele is entitled to qualified immunity. We therefore reverse the decision of the District Court and remand for further proceedings.

**I. Factual and Procedural History**

In May 2002, Jones was hired as a special investigator for the Pennsylvania Office of Inspector General (" OIG" ).[FN1] The OIG is responsible for investigating allegations of fraud, waste, misconduct, and abuse in executive agencies of the Commonwealth. At the time of the events at issue in this case, Sattele was an Investigations Manager at OIG and was Jones's supervisor.

FN1. Jones had previously been employed by OIG. He left that position in 1991.

In mid to late-July 2002, Jones was given a lead role in the investigation of Steve Fiorello, the chief pharmacist at Harrisburg State Hospital. There was only one other person assigned to the investigation. A few weeks after the investigation began, Jones told Sattele that he was concerned about problems in the pharmaceutical industry that went beyond the Fiorello investigation-specifically that he believed the industry was routinely bribing state officials. Jones informed Sattele that he wanted to broaden the Fiorello investigation to include the entire pharmaceutical industry. Thereafter, Jones continued to inform Sattele about his concerns regarding the industry.

In response, Sattele told Jones to stay focused on the Fiorello investigation and not to investigate corruption in the pharmaceutical industry as a whole. Sattele subsequently removed Jones from his lead role in the Fiorello investigation in September 2002[FN2] because Jones had, in Sattele's words, " lost focus." Sattele based this conclusion on the fact that Jones continued to voice concerns about the entire pharmaceutical industry even after Sattele had told him to concentrate only on Fiorello.

FN2. Jones was still assigned to that investigation even though his role had changed.

In October 2002, Dwight McKee, one of Jones's colleagues at OIG, filed a complaint against other OIG employees, alleging that they had retaliated against him for exercising his First Amendment rights. In November 2002, an amended complaint was filed, joining Jones as a plaintiff and Sattele as a defendant. Jones brought a cause of action under 42 U.S.C. § 1983, alleging that Sattele and the other defendants had also retaliated against him for exercising his First Amendment rights. Jones claimed generally that he was retaliated against-through intimidation and harassment by his supervisors-for complaining to his supervisors that public corruption investigations were being obstructed and delayed for reasons that were not legitimate.

In particular, at his deposition Jones identified three comments by Sattele that he perceived as harassment in retaliation for his refusal to stop voicing his concerns about the pharmaceutical industry.[FN3] First, he testified that Sattele told him that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN3. Jones also identified a fourth incident that he alleged was harassment, involving Henry Hart, another defendant. Hart, however, is not a party to this appeal, and as that incident is not relevant to our decision, we do not discuss it here.

***168** Mac [McKee] was torpedoed. Some of the things that he got maybe he deserved, but a lot of them he didn't. He was torpedoed. You keep your mouth shut.... Mac has been torpedoed, keep your mouth shut or the same thing can happen to you.
In a similar vein, Jones recalled that Sattele told him, in early October 2002, that if Jones could not adjust to the way OIG operated, he would have to leave his employment there.

Second, Jones testified that Sattele told him to " quit being a salmon," by which he meant that Jones should " quit swimming against the current with the pharmaceutical case." (Sattele testified at his deposition that he told Jones to " go with the flow" and not " swim against the current" because he was concerned that Jones was not working with the lawyers in the office and was not operating within a " team concept." )

Third, Jones related an incident that occurred in October 2002, after he had been removed as co-leader of the Fiorello investigation. Jones stated that thereafter he was not allowed to speak to anyone about the investigation without Sattele's permission. He nevertheless went to pick up documents from Fiorello, the target of the investigation, while Sattele and another of his supervisors were out of the office. Jones testified that, when he got back, Sattele met him " first thing," took him into a room with another OIG colleague, " and demanded to know why [he] went ... without [Sattele's] permission to pick up papers." Jones also stated that Sattele and his colleague accused Jones of having had an interview with the Director of the Department of Public Welfare, something Jones denied.

All defendants moved for summary judgment in August 2003, and the District Court granted the motion with respect to all defendants except Sattele in February 2004. As for Jones's claims against Sattele, the District Court determined, based on the three comments identified by Jones, that (1) " with respect to Mr. Sattele, Mr. Jones has presented evidence that could lead a reasonable jury to conclude that his requests to investigate the pharmaceutical industry were a substantial or motivating factor in the retaliatory harassment or intimidation he may have suffered" and (2) it could not decide whether Sattele had qualified immunity absent a factual determination as to whether Sattele's conduct constituted retaliatory harassment. In its decision, the District Court also determined that Jones was not disciplined in connection with voicing his concerns about the pharmaceutical industry and that " [a]t no time during his employment has Mr. Jones's job classification, pay, or benefits been reduced or altered." Sattele now appeals from the denial of summary judgment on qualified immunity grounds.

### II. Jurisdiction & Standard of Review

The District Court had federal question jurisdiction over Jones's 42 U.S.C. § 1983 claim pursuant to 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291 and the collateral order doctrine. *See* *Doe v. Groody,* 361 F.3d 232, 237 (3d Cir.2004) (" [A] denial of qualified immunity that turns on an issue of law-rather than a factual dispute-falls within the collateral order doctrine that treats certain decisions as ' final' within the meaning of 28 U.S.C. § 1291." (citing, *inter alia, Behrens v. Pelletier,* 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996))); *Forbes v. Twp. of Lower Merion,* 313 F.3d 144, 147 (3d Cir.2002) (" When a defendant moves for summary judgment based on qualified immunity, the denial of the motion may be appealed immediately under the collateral-***169** order doctrine because ' [t]he entitlement is an *immunity from suit* rather than a mere defense to liability [ ] and ... is effectively lost if a case is erroneously permitted to go to trial.' " (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)) (alterations, emphasis, and omission in original)). FN4

FN4. Sattele contends that there is no factual dispute preventing us from exercising jurisdiction over this appeal, and Jones does not dispute that position.

[1][2] We exercise plenary review over the District Court's conclusions of law in its qualified immunity analysis. *Doe,* 361 F.3d at 237. In addition, " we may review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right, but we may not consider whether the district court correctly identified the set of facts that the summary judgment

record is sufficient to prove." *Forbes,* 313 F.3d at 147 (internal quotation marks omitted).

We note also that at this stage of the litigation we are looking at the facts as presented by Jones, *i.e.,* Satelle's statements were retaliatory, rather than the exercise by Satelle of appropriate supervisory limits on Jones's performance of his assignment.

**III. Discussion**

[3][4] Qualified immunity insulates government officials performing discretionary functions from suit " insofar as ' their actions could reasonably have been thought consistent with the rights they are alleged to have violated.' " *Id.* at 148 (quoting *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). To determine whether an official has lost his or her qualified immunity, we must first " decide ' whether a constitutional right would have been violated on the facts alleged....' " *Doe,* 361 F.3d at 237 (quoting *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)) (omission in original). If the answer to that question is " yes," we must then " consider whether the right was ' clearly established.' " *Id.* at 238 (quoting *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151). If we also answer " yes" to the second question, we must conclude that the official does not have qualified immunity.

Sattele contends that he is entitled to qualified immunity because (1) his three statements to Jones about his work on the Fiorello investigation did not deprive Jones of his First Amendment rights, and (2) even if Jones did allege a violation of a constitutional right, that right was not clearly established at the time Sattele made the comments. We address each argument in turn.

A. *Did Sattelle Violate a Constitutional Right of Jones?*

[5] " A public employee has a constitutional right to speak on matters of public concern without fear of retaliation." *Brennan v. Norton,* 350 F.3d 399, 412 (3d Cir.2003) (internal quotation marks omitted). In light of this fundamental principle, we have held that, in certain circumstances, a public employee may bring a cause of action alleging that his or her First Amendment rights were violated by retaliatory harassment for the employee's speech about a matter of public concern even if he or she cannot prove that the alleged retaliation adversely affected the terms of his or her employment. *See Suppan v. Dadonna,* 203 F.3d 228, 234-35 (3d Cir.2000). In *Suppan,* we indicated that when the " plaintiffs' complaint allege[d] a campaign of retaliatory harassment culminating in ... retaliatory rankings [low ratings on promotion lists]," then a " trier of fact could ***170** determine that a violation of the First Amendment occurred at the time of the rankings on the promotion lists and that some relief [was] appropriate even if plaintiffs [could not] prove a causal connection between the rankings and the failure to promote." *Id.* This holding is premised on the idea that being the victim of petty harassments in the workplace as a result of speaking on matters of public concern is in itself retaliation-even if the employee cannot prove a change in the actual terms of his or her employment-and thus could be actionable under the First Amendment. *Id.* at 235.

[6] In this context, the key question in determining whether a cognizable First Amendment claim has been stated is whether " the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights...." *Id.* at 235 (internal quotation marks omitted). The effect of the alleged conduct on the employee's freedom of speech " ' need not be great in order to be actionable,' " but it must be more than *de minimis. Id.* (quoting *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982) (Posner, J.)); *see also Brennan,* 350 F.3d at 422 n. 17 (noting that " incidents of what might otherwise be trivial ' harassment' " may be actionable through their " cumulative impact ... even though the actions would be *de minimis* if considered in isolation" ). As stated earlier, the District Court determined that Jones's allegation that Sattele retaliated against him for speaking out about the pharmaceutical industry met the standards set out in *Suppan.*

[7] Sattele does not dispute the District Court's conclusion that Jones sufficiently alleged that he was speaking out on a matter of public concern. Sattele does argue, however, that the District Court's conclusion (by pointing to the three statements Sattele made to Jones, the latter alleged a retaliatory harassment claim under the First Amendment) was incorrect. In particular, Sattele contends that his three allegedly retaliatory comments were trivial and insufficient to deter a person of ordinary firmness from exercising his First Amendment rights. We agree.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Despite our holding in *Suppan* that a plaintiff's allegation of a " campaign of retaliatory harassment" by a public employer as a result of the plaintiff's speech created a cognizable First Amendment claim even without an alleged causal connection to a change in the plaintiff's terms of employment, not every critical comment-or series of comments-made by an employer to an employee provides a basis for a colorable allegation that the employee has been deprived of his or her constitutional rights. *See* Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir.2000) (stating that " not every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation" ); Bart, 677 F.2d at 625 (holding that plaintiff had alleged an actionable First Amendment claim when she claimed that " an entire campaign of harassment[,] which though trivial in detail may have been substantial in gross," had been mounted against her, but cautioning that " [i]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise" ). We have noted that " ' courts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands.' " Brennan, 350 F.3d at 419 (quoting Suarez, 202 F.3d at 686) (holding that allegations that a supervisor stopped using the plaintiff's***171** job title and did not capitalize the plaintiff's name as a result of plaintiff's speech, even if true, did not rise to the level of a constitutional violation because they were *de minimis*). The comments made by Sattele fall into this category.

Sattele's statements to Jones in the fall of 2002 were all aimed at getting Jones to focus on the investigation to which he was assigned-looking into the activities of a particular person in a particular state agency-instead of focusing on Jones's own wide-ranging concerns about the pharmaceutical industry as a whole, something that OIG was not investigating. There is no question Sattele's statements were critical of Jones's job performance, and they may be construed as reprimands for Jones's continued expressions of concern about potential corruption in the pharmaceutical industry. However, even looking at the record in the light most favorable to Jones (as we must at this stage in the proceedings), we cannot conclude that Sattele's comments, taken together, would have deterred a person of ordinary firmness from exercising his First Amendment rights.

In *Suppan,* the plaintiffs allegedly were subjected to repeated chastisements and threats from their superiors over a period of more than a year based on their membership in a union negotiating team, and they alleged that they were given low ratings on their promotion eligibility evaluations in retaliation for those activities. 203 F.3d at 230-31. By contrast, Jones was admonished a few times for straying from the scope of the task he was assigned. The District Court explicitly found that, despite Jones's changed role in the Fiorello investigation, he suffered no alteration in his employment benefits, pay, or job classification as a result of speaking out about potential corruption in the pharmaceutical industry. Based on the set of facts identified by the District Court, Jones's allegations about Sattele's conduct simply do not rise to the level of a retaliatory harassment claim under the First Amendment.

Because Jones has not alleged the deprivation of a constitutional right, Sattele is entitled to qualified immunity. For the sake of completeness however, we now turn to the second prong of the qualified immunity analysis and determine whether-assuming that Jones had sufficiently alleged the violation of a constitutional right-that right was clearly established at the time of Sattele's alleged conduct.

B. *Assuming Sattele Violated a Constitutional Right of Jones, Was that Right Clearly Established at the Time of the Alleged Conduct?*

[8] " ' [C]learly established rights' are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that right." McLaughlin v. Watson, 271 F.3d 566, 571 (3d Cir.2001). Put another way, " there must be sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." Id. at 572. The Supreme Court has recently reiterated this point, stating that " [i]t is important to emphasize that this [clearly established] inquiry ' must be undertaken *in light of the specific context of the case,* not as a broad general proposition.' " Brosseau v. Haugen, 543 U.S. 194, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004) (*per curiam*) (quoting Saucier, 533 U.S. at 201, 121 S.Ct. 2151) (emphasis added).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[9] Before Sattele allegedly engaged in the conduct at issue in this case, we held, as discussed at Section III(A), *supra,* that a public employee states a First Amendment claim by alleging that his or her ***172** employer engaged in a " campaign of retaliatory harassment" in response to the employee's speech on a matter of public concern, even if the employee could not prove a causal connection between the retaliation and an adverse employment action. *Suppan,* 203 F.3d at 234-35. We then reiterated, in *Baldassare v. New Jersey,* 250 F.3d 188 (3d Cir.2001), that " [a] public employee has a constitutional right to speak on matters of public concern without fear of retaliation." *Id.* at 194 (citing, *inter alia, Rankin v. McPherson,* 483 U.S. 378, 383-84, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)). Jones contends that *Suppan* and *Baldassare,* taken together, were sufficient precedent to put Sattele on notice that his conduct-making harassing comments to Jones arising out of Jones's voicing of concerns about corruption in the pharmaceutical industry-was constitutionally prohibited.

In *Suppan,* however, we gave little guidance as to what the threshold of actionability is in retaliatory harassment cases. Instead, we merely held that such a claim existed. *Suppan,* 203 F.3d at 235. Moreover, the alleged conduct in *Suppan* spanned more than a year and involved the supposed lowering of ratings on employees' promotion evaluations and the admonishment of employees because of their union activities and support for a particular mayoral candidate. *Id.* at 230-31. Based only on our acknowledgment of a retaliatory harassment cause of action in *Suppan* and the facts of that case, a reasonable official in Sattele's position would not have been aware that making a few comments over the course of a few months (the gist of which was asking an employee to focus on his job) might have run afoul of the First Amendment.

*Baldassare* also does not further Jones's argument that his First Amendment right to be free from retaliatory harassment was clearly established at the time of Sattele's alleged conduct. That case involved a straightforward retaliation claim brought under the First Amendment in which the plaintiff alleged a direct causal connection between his speech on a matter of public concern and his demotion, *see Baldassare,* 250 F.3d at 194 (plaintiff claimed he was demoted because of his statements regarding his investigation and report about conduct of his co-workers), not that he was subject to a campaign of retaliatory harassment such as the one involved in *Suppan* and alleged by Jones in this case. Thus, *Baldassare* would not have helped Sattele understand that his conduct might be constitutionally prohibited.[FN5]

FN5. Moreover, we note that even if *Baldassare* were relevant to determining whether Jones's right to be free from retaliatory harassment was clearly established at the time of Sattele's alleged conduct, that case would not necessarily put a reasonable official in Sattele's position on notice that making comments such as Sattele's would violate the First Amendment. Under the traditional retaliation analysis articulated in *Baldassare,* the second inquiry, after the plaintiff has established that he or she was engaging in activity protected by the First Amendment, is whether the plaintiff's " interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees." 250 F.3d at 195. We have stated that, in determining the interest of the employer for purposes of this balancing test, " we must consider ' whether the [expression] impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.' " *Id.* at 198 (quoting *Rankin,* 483 U.S. at 388, 107 S.Ct. 2891) (alteration in original). The District Court determined in this case that there was no evidence that OIG's interest in conducting an efficient investigation was impaired by Jones's speech. However, given our precedent on this issue, a reasonable official in Sattele's position could have *understood* his actions toward Jones as being justified because the need to maintain efficient working relationships and to improve Jones's performance of his duties on the Fiorello investigation outweighed his interest in speaking generally about potential corruption in the pharmaceutical industry, a matter outside the scope of the investigation

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> OIG was conducting. *Cf.* Sprague v. Fitzpatrick, 546 F.2d 560, 565 (3d Cir.1976) (holding that, even though speech leading to public employee's discharge " concerned matters of grave public import," the balance weighed against finding that speech protected by the First Amendment when it had " completely undermined" the effectiveness of the employer-employee relationship).

***173** We did touch on the retaliatory harassment theory again in our *Brennan* decision, noting once more that " a plaintiff may be able to establish liability under § 1983 based upon a continuing course of conduct even though some or all of the conduct complained of would be *de minimis* by itself or if viewed in isolation." 350 F.3d at 419 n. 16. *Brennan* provided some additional guidance about what types of conduct would support such a claim, holding that some of the plaintiff's allegations (that he had been taken off the payroll for some time and given various suspensions as a result of his speech) would support a retaliation claim, whereas other of his allegations (including his claim that his supervisor stopped using his title to address him) would not because of their triviality. *Id.* at 419. However, *Brennan* was not decided until 2003, after Sattele's alleged conduct, which occurred in the fall of 2002, had already taken place. Thus, to the extent that *Brennan* added some specificity to the contours of the retaliatory harassment cause of action, an employee's First Amendment right to be free from such harassment was still not clearly established at the time of Sattele's conduct. *See* Brosseau, 125 S.Ct. at 600 n. 4 (noting that the parties had pointed the Court to " a number of ... cases ... that postdate the conduct in question" and that " [t]hese decisions, of course, could not have given fair notice to [the official] and are of no use in the clearly established inquiry" ).

Moreover, as discussed at Section III(A), *supra,* we also stated in *Brennan* that courts have not found violations of employees' First Amendment rights " where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands." 350 F.3d at 419 (internal quotation marks omitted). *Brennan* therefore lends support to Sattele's argument that his critical comments to Jones did not violate Jones's First Amendment rights.

Accordingly, because of the dearth of precedent of sufficient specificity (and factual similarity to this case) regarding a public employee's First Amendment right to be free from retaliatory harassment by his or her employer at the time of Sattele's conduct, we cannot say that the constitutional right Jones alleged Sattele violated was clearly established. Sattele is therefore entitled to qualified immunity under the second, as well as the first, prong of our *Saucier* analysis.

## IV. Conclusion

The three comments made by Sattele in response to Jones's voicing of his concerns about potential corruption in the pharmaceutical industry, although critical of Jones's speech, were all intimately related to Jones's job performance and would not have deterred a person of ordinary firmness from exercising his or her First Amendment rights. As the District Court found, the comments were also unaccompanied by any change in Jones's employment benefits or wages. We cannot conclude, based on this factual situation, that ***174** Jones alleged a deprivation of a constitutional right.

Moreover, even if there had been such a deprivation, Jones's constitutional right to be free from a campaign of retaliatory harassment was not clearly established at the time of Sattele's alleged conduct. *Suppan* (and *Baldassare* to the extent it is applicable), although they were decided before the events at issue in this case, did not define the bounds of a retaliatory harassment cause of action with sufficient specificity, nor were their facts sufficiently similar to those alleged here, such that Sattele would have been on notice that his conduct was constitutionally prohibited.

Accordingly, Sattele is entitled to qualified immunity, and we reverse the contrary decision of the District Court and remand for further proceedings.

C.A.3 (Pa.),2006.
McKee v. Hart
436 F.3d 165, 152 Lab.Cas. P 60,134, 23 IER Cases 1527

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2001 WL 111611 (E.D.Pa.)

**(Cite as: Not Reported in F.Supp.2d)**

H

Leipziger v. Township of Falls
E.D.Pa.,2001.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Robert LEIPZIGER and Rob's Automotive & Collision Center, Inc.
v.
TOWNSHIP OF FALLS, et al.
**No. CIV.A. 00-1147.**

Feb. 1, 2001.

*MEMORANDUM AND ORDER*

BECHTLE.

*1 Presently before the court are defendants the Township of Falls, *et al.*' s (collectively " Defendants" ) Motion to Dismiss Plaintiffs' Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6) or, Alternatively, Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56; [FN1] plaintiffs Robert Leipziger's and Rob's Automotive & Collision Center, Inc.'s (collectively " Plaintiffs" ) Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56; the memoranda in support of said motions and the responses thereto. For the reasons set forth below, the court will grant the motions in part and deny them in part.

FN1. Because Defendants have submitted evidence beyond the pleadings that the court will consider, the court will treat Defendants' motion as a motion for summary judgment.

I. *BACKGROUND*

Plaintiffs Robert Leipziger (" Leipziger" ) and Rob's Automotive & Collision Center, Inc. (" Rob's Automotive" ) brought suit under 42 U.S.C. § 1983 and Pennsylvania common law, alleging that Defendants violated Plaintiffs' constitutional and contractual rights by removing Rob's Automotive from the Township of Falls' (" Township" ) list of approved towing companies. (Pls.' Mem. of Law in Supp. of Mot. for Summ. J. (" Pls.' Mot. for Summ. J." ) at 1.) Specifically, Plaintiffs assert causes of action for violations of due process (Counts I & II) and equal protection (Count III), as well as pendent state causes of action for breach of contract (Count V) and tortious interference with contract (Count VI). Plaintiffs also seek punitive damages (Count IV). [FN2]

FN2. The parties have stipulated that the proper party-plaintiff in this action is Rob's Automotive, and not Leipziger, the company's sole shareholder. *See* Defs.' Mot. to Dismiss Pls.' Compl. Pursuant to Fed.R.Civ.P. 12(b)(1) and (6) or, Alternatively, Mot. for Summ. J. Pursuant to Fed.R.Civ.P. 56 (" Defs.' Mot. for Summ. J." ) Ex. H at 13-16; *see also Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1278 (3d Cir.1994) (holding that individual shareholders have no standing to sue under § 1983 for injury to corporation); *Kelly v. Thomas,* 234 Pa. 419, 83 A. 307 (Pa.1912) (holding that shareholder has no standing to assert cause of action for injuries to corporation); *Kehr Packages v. Fidelity Bank, N.A.,* 710 A.2d 1169, 1176 (Pa.Super.1998) (same). Accordingly, summary judgment will be entered in favor of Defendants on all claims asserted by Leipziger.

Defendants include: the Township; Township Manager Wayne Bergman (" Bergman" ); Phillip A. Szupka, William Dayton, and Richard Otto, who are current members of the Township's Board of Supervisors (" Board" ); and former Board member James P. Rhein.[FN3] (Defs.' Mot. for Summ. J. at 2.)

FN3. Szupka, Dayton, Otto and Rhein will be referred to collectively as the " Supervisors."

To facilitate the free flow of traffic, the Township uses a list of " licensed" towing companies to call when disabled vehicles need to be removed from streets. (Defs.' Mem. of Law in Supp. of Defs.' Answer to Pls.' Mot. for Summ. J. (" Defs.' Resp." ) at 2.) There are a maximum of seven companies on the list at any one time. Township of Falls Code § 206-3(B). The towers are put on a rotating schedule, and the Township may call only towers on the list to perform removal services. *Id.* § 206-3(A). However, a vehicle owner still has the right to select any tower,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 2
Not Reported in F.Supp.2d, 2001 WL 111611 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

regardless of whether it is on the list. *Id.* § 206-12.

The ordinance establishes a specific procedure for appointment to the list. This procedure requires public notice of a vacancy, solicitation of applications, qualification of the applicants, and a lottery among eligible participants. *Id.* § 206-15. To determine whether an applicant meets the eligibility requirements, which include having a registered place of business within the Township and a minimum amount of storage space, the police are required to investigate an applicant within 5 days of receiving an application. *Id.* § 206-6. The Board appoints a selected applicant to the list by amendment to the ordinance.

Once awarded, a license continues annually so long as the licensee fulfills all of the requirements of the original application. *Id.* § 206-15. A tower can only be removed from the list upon 10 days written notice and a hearing at which the Township Manager finds as a fact that the tower committed a disqualifying offense enumerated under § 206-11. *Id.* § 206-11.

***2** Certain facts are not disputed. From 1992 through 1999, Leipziger submitted applications on behalf of Rob's Automotive. (Pls.' Mot. for Summ. J. at 1.) On November 10, 1999, the Board finally approved Leipziger's application and placed Rob's Automotive on the list. *Id.* at 1-2. Defendant supervisors Otto and Rhein were absent from that meeting, although Rhein supported Rob's Automotive's appointment. (Defs.' Resp. at 3-4.) Later that year, a new Board was elected. (Pls.' Mot. for Summ. J. at 2.) On January 3, 2000, the new Board held a meeting at which it voted 4-1 to remove Rob's Automotive from the towing list. *Id.;* Defs.' Resp. at 3-4. Dayton, Szupka, Otto and Rhein were the supervisors who voted for removal.[FN4] (Defs.' Resp. at 4.)

FN4. Dayton and Szupka took office on January 3, 2000, and thus did not participate in the November 1999 appointment of Rob's Automotive to the list. *Id.*

All parties acknowledge that the removal procedure set forth by the ordinance was not followed. (Pls.' Mot. for Summ. J. at 2; Defs.' Resp. at 3.) For example, there was: no public notice; no ten days notice and hearing provided to Rob's Automotive; no solicitation of applications; no qualification of applicants; no lottery; and no ordinance amendment advertised and adopted. (Pls.' Mot. for Summ. J. at 2; Defs.' Resp. at 3.) Rob's Automotive asserts, and Defendants concede, that it was not removed because it violated a provision of the ordinance. Rather, Rob's Automotive was removed because the former Board did not follow proper procedures when it placed Rob's Automotive on the list. (Pls.' Mot. for Summ. J. at 3; Defs.' Resp. at 4-5.)

Defendants argue that the action of the prior " lame-duck" Board was an improper attempt to control the new Board, and that this action was a nullity because proper procedures were not followed. (Defs.' Resp. at 9.) They assert that there was no vacancy on the list when Rob's Automotive was appointed and that Rob's Automotive does not meet the ordinance's standards. *Id.* at 11. Defendants contend that the current vacancy will be filled at the conclusion of this litigation by following the procedures set forth in the ordinance, and that Rob's Automotive is free to apply for inclusion. *Id.* at 5, 9, & 12. Lastly, they argue that the former board never received a completed application from Rob's Automotive or Leipziger in November 1999 or conducted the requisite investigation of Rob's Automotive.[FN5] *Id.* at 5-8.

FN5. Although Defendants assert that the police did not investigate Rob's Automotive because they never received a completed application, they admit that the Township maintains no central filing system for these applications and keeps no updated list of potential applicants. (Defs.' Resp. at 8.)

Rob's Automotive contends that a proper application was submitted prior to the November 1999 Board meeting. (Pls.' Mot. for Summ. J. at 4.) It asserts that it meets all of the standards set forth by the ordinance, that all but one of the towers currently on the list do not meet those standards, and that there has been an ongoing pattern of discrimination against it. *Id.* at 6-8. Accordingly, Rob's Automotive requests an order of summary judgment on the due process and equal protection claims. *Id.* at 8-9. Rob's Automotive suggests that if summary judgment on these claims is granted in its favor, then it should be ordered back on the list and the issues remaining to be litigated would be an assessment of damages. *Id.* at 9.

## II. *LEGAL STANDARD*

***3** Summary judgment shall be granted " if the pleadings, depositions, answers to interrogatories,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 3

Not Reported in F.Supp.2d, 2001 WL 111611 (E.D.Pa.)

**(Cite as: Not Reported in F.Supp.2d)**

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute is material only if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Whether a genuine issue of material fact is presented will be determined by asking if " a reasonable jury could return a verdict for the non-moving party." *Id.* In considering a motion for summary judgment, " [i]nferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992) (citation omitted).

III. *DISCUSSION*

Rob's Automotive claims that the Board's actions violated the due process and equal protection guarantees of the Fourteenth Amendment, as well as state common law. Defendants assert defenses based on, *inter alia,* absence of a constitutionally protected interest, absolute immunity, qualified immunity, sovereign immunity, the statute of limitations, and absence of a contract. [FN6] The court will address Rob's Automotive's claims and the Township's and Supervisors' defenses seriatim.

FN6. Defendants also assert that because Rob's Automotive failed to pursue established state procedure for challenging local government decisions, its claim is not ripe and the court lacks subject matter jurisdiction. Specifically, Defendants point out that Rob's Automotive has not filed an appeal in the Court of Common Pleas or otherwise made any effort to obtain review or reconsideration of the January 3, 2000 decision. (Defs.' Mot. to Dismiss at 16.) However, the cases cited by Defendants in support of this argument either concern the narrow issue of regulatory takings or do not address ripeness at all. In the absence of citation to contrary authority, the court concludes that the Township's decision to remove Rob's Automotive from the towing list was a sufficient final action to make the instant dispute ripe, regardless of whether Rob's Automotive pursued state remedies for its federal claims. *See McNeese v. Bd. of Educ.,* 373 U.S. 668, 671, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963) and *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (setting forth general rule that relief under § 1983 may not be defeated because relief was not first sought under state law).

A. *Plaintiffs' Due Process and Equal Protection Claims*

The Civil Rights Act provides civil redress for plaintiffs injured by persons or entities acting under color of state law in violation of the Constitution or laws of the United States. 42 U.S.C. § 1983. To prevail on a § 1983 claim, Rob's Automotive must prove that: (1) Defendants acted under color of state law; (2) depriving Rob's Automotive of a right secured by federal law; and (3) damages. *Samerik v. City of Philadelphia,* 142 F.3d 582, 590 (3d Cir.1998); *Kelly v. Borough of Sayreville,* 107 F.3d 1073, 1077 (3d Cir.1997); *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1141 (3d Cir.1995).

It is undisputed that Defendants acted under color of state law in taking every action that is relevant to the instant dispute.[FN7] However, Defendants contend that Rob's Automotive has suffered no constitutional deprivation.

FN7. As an initial matter, the court concludes that no cause of action lies against defendant Bergman. His only involvement in the relevant events was writing the letter that informed Rob's Automotive of the Board's decision to remove it from the list. He had no role in the Board's decision or the actual removal of Rob's Automotive. Plaintiffs cite no authority for the proposition that a public official's mere act of informing someone of the actions taken by a public body of which he is not a member, even if those actions are unconstitutional, can give rise to a cause of action under § 1983. Accordingly, summary judgment will be entered in favor of defendant Bergman. For the remainder of the court's opinion, the term " Defendants" will refer to all named defendants except Bergman.

1. Substantive Due Process

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

" Substantive due process refers to and protects federal rights." Nicholas v. Pa. State Univ., 227 F.3d 133, 141 (3d Cir.2000) (citations omitted). To prevail on his substantive due process claim, a plaintiff must first establish that he has " a protected property interest to which the Fourteenth Amendment's due process protection applies." *Id.* at 139 (citations omitted). Although it is settled that state-created property interests are entitled to protection under procedural due process, " not all property interests worthy of procedural due process protection are protected by the concept of substantive due process." *Id.* (internal quotations and citations omitted). Accordingly, to state a substantive due process claim, a plaintiff must have been deprived of " a particular quality of property interest." *Id.* (quotations and citations omitted). " [W]hether a certain property interest embodies this particular quality ... depends on whether that interest is fundamental under the United States Constitution." *Id.* (quotations and citations omitted).

As Defendants point out, it is unclear whether Rob's Automotive is asserting a substantive due process claim. (Defs.' Resp. at 10.) Additionally, Rob's Automotive cites no authority for the proposition that a mere license to tow disabled vehicles falls within the narrow definition of a fundamental property interest. *See, e.g.,* Nicholas, 227 F.3d at 142-43 (holding that public employment not fundamental property interest for purpose of substantive due process); *Homar v. Gilbert,* 63 F.Supp.2d 559 (M.D.Pa.1999) (loss of service contract does not warrant substantive due process protection); *Holt Cargo Systems, Inc. v. Delaware River Port Auth.,* 20 F.Supp.2d 803 (E.D.Pa.1998) (loss of customers, profits, bids or breach of lease do not constitute substantive due process claims). Thus, to the extent that Rob's Automotive asserts such a claim, the court will grant Defendants' motion for summary judgment.

2. Procedural Due Process

***4** The Due Process Clause provides that no state shall " deprive any person of life, liberty, or property, without due process of law." To establish a cause of action for a violation of procedural due process, a plaintiff must prove that a person acting under color of state law deprived him of a protected interest and that the state procedure for challenging the deprivation does not satisfy the requirements for procedural due process. *Homan v. City of Reading,* 15 F.Supp.2d 696, 699 (E.D.Pa.1998) (" *Homan II* ") (citing *Midnight Sessions, Ltd. v. City of Philadelphia,* 945 F.2d 667, 680 (3d Cir.1991)). A property interest protected by the due process clause results from a " legitimate claim of entitlement created by an independent source such as state law." *Id.* (citing *Midnight Sessions, Ltd.,* 945 F.2d at 679). If such a property interest is deprived, due process requires notice and a meaningful opportunity to be heard. *Id.* (citing *Midnight Sessions, Ltd.,* 945 F.2d at 680).

The license issued to Rob's Automotive is clearly an entitlement warranting the protections of procedural due process. As the Supreme Court noted with regard to a driver's license in *Bell v. Burson:*

Once licenses are issued ... their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment.

*Bell,* 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (citations omitted). As far as this court is aware, every federal court that has addressed the instant question-whether a rotational towing list established pursuant to a state statute or local ordinance creates a property right entitling the licensee to due process protection-has answered in the affirmative. *Pritchett v. Alford,* 973 F.2d 307, 317 (4th Cir.1992); *Abercrombie v. City of Catoosa,* 896 F.2d 1228, 1232 (10th Cir.1990); *Crownhart v. Thorp,* Civ. No. 92-20227, 1992 WL 332298, at *2-3 (N.D.Ill.1992); *Gregg v. Lawson,* 732 F.Supp. 849, 853 (E.D.Tenn.1989)); *see also Henson v. City of Syracuse,* 559 N.Y.S.2d 1064, 1066 (N.Y.Sup.Ct.1990) (towing company had protected property interest in continuing to have name on rotational towing list so as to have Fourteenth Amendment due process right to pre-removal hearing).

Defendants cite *Garner v. Township of Wrightstown* for the proposition that it is not clearly established that there is a protected property right to be included on a towing list. *Garner,* 819 F.Supp. 435 (E.D.Pa.1993). In *Garner,* the court found that the plaintiff tower did not have a constitutionally protected property right in an *informal* towing agreement with the township. *Id.* at 444. In the absence of a formal license, Judge Brody stated that at most, termination of the informal agreement could

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 5

Not Reported in F.Supp.2d, 2001 WL 111611 (E.D.Pa.)

**(Cite as: Not Reported in F.Supp.2d)**

give rise to a claim for breach. *Id.* However, she opined that had the plaintiff's state salvor's license been revoked, she " would be inclined to agree that *Bell* would apply." *Id.* Thus *Garner* supports the proposition that the formal licensing system adopted by the Township's ordinance in the instant case created an entitlement warranting due process protection.

***5** Defendants, rather interestingly, contend that Rob's Automotive's claims are insupportable *because* the former Board never properly appointed it to the list. (Defs.' Resp. at 4-5.) Thus, Defendants claim that because Rob's Automotive was never properly appointed, the procedures for removal set forth in the ordinance never came into effect. *Id.*

This argument is meritless.[FN8] Once Rob's Automotive was put on the list, it had a protected property interest entitling it to a pre-removal hearing. Whether the Board followed proper procedures in appointing Rob's Automotive is irrelevant to the issue of whether a pre-removal hearing was required. The Township appears to have recognized the need for such a hearing by providing for a removal hearing in the ordinance. If the Township believes that the proper procedures were not followed in appointing Rob's Automotive to the list, that issue should have been addressed at a pre-removal hearing after notice to Rob's Automotive and an opportunity for it to present objections. Accordingly, Rob's Automotive has demonstrated that the Defendants violated its procedural due process rights. The court will address Defendants' immunity defenses *infra.*

> FN8. If the court were to accept Defendants' argument, the Township could purposefully fail to follow proper appointment procedures in order to ensure that it need not provide any type of procedure whatsoever when removing a tower from the list. Such a result would be ludicrous.

3. Equal Protection

" The Equal Protection Clause prevents governments from making *improper* classifications and from applying proper classifications in such a way as to indicate that improper classifications are being drawn in the administrative process." *Mohammed v. Mathog,* 635 F.Supp. 748, 752 (E.D.Mich.1986). A plaintiff who asserts an equal protection claim based on selective enforcement of the law must show that: (1) the plaintiff, compared with others similarly situated, was selectively treated; and (2) the selective treatment was motivated by an intent to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person. *Homan II,* 15 F.Supp.2d at 702 (citations omitted). Each prong of the test is to be applied separately and " failure to satisfy either inquiry [is] fatal to the plaintiff's claim." *Id.* (citations omitted); *see Anderson v. Douglas County,* 4 F.3d 574, 577 (8th Cir.1993) (party claiming equal protection violation must establish that it is " similarly situated" to other applicants for the license, permit or other benefit being sought, particularly with respect to same time period); *Mohammed,* 635 F.Supp. at 752 (dismissing equal protection claim for failure to allege that discrimination infringed fundamental right or was based on improper criteria such as race, age, sex, national origin, religion, or disability). A demonstration that persons similarly situated were treated differently does not, without more, establish malice or bad faith. *Crowley v. Courville,* 76 F.3d 47, 53 (2d Cir.1996).

As an initial matter, Rob's Automotive alleges and presents some evidence that other similarly situated towers were treated differently. For example, Rob's Automotive contends that all but one of the listed towers fails to meet the ordinance's qualifications. *See* Pls.' Mot. for Summ. J. at 6 (citing as support testimony by Leipziger, Harkins, Bergmen and Dillon).

***6** Even assuming, *arguendo,* that this contention is true, Defendants are entitled to summary judgment on the equal protection claim. Rob's Automotive has neither alleged nor proffered any evidence indicating that the Board's treatment of it infringed a fundamental right or was based on an impermissible criteria such as race, religion, or ethnicity. Furthermore, there is no evidence that the Board's action was motivated by a malicious or bad faith intent to injure Rob's Automotive or Leipziger. All of the Supervisors testified that they did not know Leipziger or Rob's Automotive and thus had no motivation to injure either of them. (Defs.' Mot. for Summ. J. at 23-24 & Exs. A-F.) Furthermore, Leipziger testified that he does not know any of the Supervisors personally and that none of them expressed personal animosity toward him or his company. *Id.* Ex. H. Also, the court can discern no pattern of discrimination in the evidence presented.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 6

Not Reported in F.Supp.2d, 2001 WL 111611 (E.D.Pa.)

**(Cite as: Not Reported in F.Supp.2d)**

Thus, despite Rob's Automotive's assertions that it should be permitted to present evidence of damages from the Board's " refusal to grant [it] the equal protection of the law" arising from the ongoing refusal to put it on the list, Rob's Automotive will not be entitled to damages from any actions by the Board except those related to its removal from the list.FN9 Accordingly, the court will grant summary judgment in favor of Defendants on Rob's Automotive's equal protection claim.

FN9. Defendants also argue that Plaintiffs' claims extending back to 1991 are barred because " the applicable statute of limitations, by reference to the closest analogous state cause of action, should be two years." *See* Defs.' Mot. for Summ. J at 25 (citing *Aitchison v. Raffiani,* 708 F.2d 96 (3d Cir.1983)). However, Defendants do not indicate what the closest analogous state cause of action is or cite any specific statute of limitations. Furthermore, the case cited by Defendants, *Aitchison,* applied New Jersey law, rather than Pennsylvania law, to determine whether a § 1983 claim was time-barred. *Aitchison,* 96 F.2d at 100-03. Because of the lack of clarity with which this argument is put forth, the court cannot rely on it as a basis to grant summary judgement in favor of Defendants.

B. *Contract Claims: Breach and Tortious Interference*

Rob's Automotive asserts that it offered to provide towing service to the Township for years, that in November 1999 the Township accepted its offer and a contract was entered into, the terms of which were outlined in the Township ordinance. (Pls.' Mot. for Summ. J. at 17.) According to Plaintiff, the removal of Rob's Automotive from the towing list without just cause and a hearing breached the contract. *Id.* Defendants assert that there was no contract. (Defs.' Resp. at 24.)

The court must address three factors in determining whether a contract exists under Pennsylvania law: (1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration. *Atacs Corp. v. Trans World Comms., Inc.,* 155 F.3d 659, 666 (3d Cir.1998). Furthermore, to prevail on a tortious interference with contract claim, a plaintiff must prove: (1) an existing contractual relationship between the plaintiff and a third-party; (2) that the defendant interfered with the contract by inducing a breach or otherwise causing the third-party not to perform; (3) that the interference was not privileged; (3) and that the plaintiff suffered actual harm or damage as a result of the defendant's actions. *AL Hamilton Contracting Co. v. Cowder,* 434 Pa.Super. 491, 644 A.2d 188, 191 (Pa.Super.1994). The element of threshold importance is intent to harm the plaintiff. *Prudential Ins. Co. of Am. v. Stella,* 994 F.Supp. 318, 322 (E.D.Pa.1998).

Rob's Automotive cites no authority in support of its argument that a contract is formed through a licensing procedure such as the one established by the Township. Furthermore, the court finds it unlikely that a Pennsylvania court would find that a contractual relationship existed between Rob's Automotive and the Township. For example, it does not appear that either party was " bound" to perform. The listed towers were not obligated to respond to calls, and the Township does not appear to have been obligated by anything but its own ordinance to call the towers on the list. Therefore there was no intent to be bound and no consideration. Rob's Automotive does not claim that there was any oral or written agreement between it and the Township. (Defs.' Mot. for Summ. J. Ex. H.) Thus, the court concludes that no contract existed between the Township and Rob's Automotive. Accordingly, Defendant's motion will be granted to the extent that it seeks summary judgment on the contract and tortious interference with contract claims.

C. *Defendants' Assertions of Immunity*

*7 The Supervisors assert that they are entitled (1) to absolute immunity because removal of Rob's Automotive was a legislative act; or at least (2) to qualified immunity because their conduct did not violate clearly established constitutional rights. The Township argues that sovereign immunity shields it from suit. Because summary judgment will be granted in favor of Defendants on the substantive due process, equal protection, breach of contract and tortious interference with contract claims, the court need only address immunity from suit on the procedural due process claim.

1. Absolute Immunity

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 7

Not Reported in F.Supp.2d, 2001 WL 111611 (E.D.Pa.)

(Cite as: Not Reported in F.Supp.2d)

It is generally understood that local government bodies are given a combination of proprietary, managerial and legislative powers. Ryan v. Burlington County, 889 F.2d 1286, 1290 (3d Cir.1989). However, members of such bodies enjoy absolute immunity only with respect to the legislative powers delegated to them by the state legislature. *Id.* (citing Aitchison, 708 F.2d 96; Donivan v. Dallastown Borough, 835 F.2d 486 (3d Cir.1987)).

For legislative immunity to apply, the relevant act must: (1) be legislative in character, i.e., an act involving a policy making decision of a general scope; and (2) accord with constitutionally accepted procedures of enacting legislation. *Id.* at 1290-91.

The act of removing Rob's Automotive from the towing list is clearly not legislative in nature. It did not affect any tower except for Rob's Automotive, and thus cannot be said to involve a policy making decision of general scope. *See id.* at 1291 (stating that " [w]here the decision affects a small number or a single individual, the legislative power is not implicated, and the act takes on the nature of administration" ). Accordingly, the Supervisors are not entitled to absolute immunity.

2. Qualified Immunity

***8** Governmental officials performing discretionary functions are generally shielded from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Sherwood v. Mulvihill, 113 F.3d 396, 398-99 (3d Cir.1997). Officials who reasonably but mistakenly conclude that their conduct comports with constitutional requirements are entitled to immunity. Sharrar v. Felsing, 128 F.3d 810, 826 (3d Cir.1997) (quoting Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)).

The court concludes that the Supervisors cannot avail themselves of the defense of qualified immunity. In so holding, the court finds the reasoning of Pritchett v. Alford instructive. Pritchett, 973 F.2d 307. In *Pritchett,* the Fourth Circuit addressed the almost identical situation of a local governmental official removing a tower from a government towing list, and began its analysis of qualified immunity by stating that:

any competent official in his position should know that before state created property rights may be cut off by officials such as he, their owner must, to the extent possible, be given, at a minimum, notice and an opportunity to be heard why they should not be; that such property right can exist not only in land and personalty, but in government-provided benefits firmly enough grounded in law to constitute entitlements rather than mere expectations or desires; and that any such benefits having economic value may therefore constitute property rights subject to procedural due process protections.

*Id.* at 317. The court went on to reject the defendant's argument that even if the state-created benefit of being on the towing list is a protected property right under these principles, that exact point was not established at the time of the due process violation. *Id.* (noting that soon after violation, at least two federal courts specifically recognized property right in being on state-prescribed wrecker service list). In doing so, it noted that a specific prior adjudication of a right is not necessary to make it " clearly established" for qualified immunity purposes. *Id.* Thus, the court stated that:any reasonably competent official in [the defendant's] position charged, as they would be, with knowing the general due process principles above outlined, must also be charged with making the obvious application of those principles to the facts of this case. That being on the list was a benefit having economic value was manifest.... That being on it by virtue of this state regulatory regime insured that it was a legally enforceable entitlement rather than a mere unilateral expectation was also manifest to any reasonably competent official charged with knowledge, as they must be, of the regulatory regime they were required to enforce.

*Id.* The court concluded, as a matter of law, that the defendant was not entitled to qualified immunity. *Id.* at 318.

***9** In the instant case, the Supervisors must also be charged with knowledge of these general due process principles and the ability to apply them to the circumstances surrounding the removal of Rob's Automotive from the towing list. Furthermore, at the time of the removal of Rob's Automotive from the list, a number of courts had specifically recognized that being on a towing list or " wrecker list" created pursuant to state or local law is a protected property right under established due process principles. Crownhart, 1992 WL 332298, at *2-3; Pritchett, 973

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 8
Not Reported in F.Supp.2d, 2001 WL 111611 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

F.2d at 317; *Abercrombie,* 896 F.2d at 1232; *Gregg,* 732 F.Supp. at 853; *Henson,* 559 N.Y.S.2d at 1066. Thus, Rob's Automotive's right to due procedures before removal from the towing list was a clearly established right of which any official in the position of the Supervisors would have known. Accordingly, the Supervisors are not entitled to qualified immunity.

3. Sovereign Immunity

The Township asserts that the Pennsylvania Political Subdivision Tort Claims Act (" Tort Claims Act" ) provides no exception for the act complained of in this case. 42 Pa.C.S.A. § 8501 *et seq.* This argument has no merit if it is asserted as a defense to the due process claim.

Pennsylvania's Tort claims act is simply irrelevant to the Township's liability under § 1983. First, a municipal corporation cannot be immunized from § 1983 liability by state law. *Howlett v. Rose,* 496 U.S. 356, 376 & 383, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990). Second, a local government can be sued under § 1983 if the action that is alleged to be unconstitutional implements " a policy, statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The action of removing Rob's Automotive from the towing list clearly constitutes a decision officially adopted by the Township's officers. Accordingly, the Township is not entitled to sovereign immunity.

Summary judgment will be entered in favor of Rob's Automotive against the Township and the Supervisors on the procedural due process claim.

D. *Punitive Damages*

Punitive and exemplary damages are not available under § 1983 against a municipality or against local officials in their official capacity. *City of Newport v. Fact Concerts,* 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981); *Agresta v. Good,* 797 F.Supp. 399, 410 (E.D.Pa.1992). Thus, Defendants' motion will be granted to the extent that it seeks to preclude punitive damages against the Township and the Supervisors in their official capacity.

Punitive damages are available against a defendant in his individual capacity. *Agresta,* 797 F.Supp. at 410 (citing *Smith v. Wade,* 461 U.S. 30, 51, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)). However, punitive damages must be reserved for cases in which the defendant's conduct amounts to something more than a violation justifying compensatory damages or injunctive relief. *Keenan v. Philadelphia,* 983 F.2d 459, 470 (3d Cir.1992); *Cochetti v. Desmond,* 572 F.2d 102, 106 (3d Cir.1973). Punitive damages are available in a § 1983 case only in special circumstances, such as when the defendant's conduct amounts to reckless or callous disregard of the federally guaranteed rights of others. *Savarese v. Agriss,* 883 F.2d 1194, 1203-05 (3d Cir.1989). It is not necessary that the conduct be intentional or motivated by an evil motive. *Id.* at 1204.

***10** Although it appears to the court that evidence weighs against an award of punitive damages, because it has been demonstrated that the Supervisor Defendants violated a clearly established constitutional right that reasonable officials in their position should have known, there is a genuine issue of material fact as to whether these defendants acted with reckless or callous disregard to the federally protected rights of Rob's Automotive. Accordingly, Defendants' motion will be denied to the extent that it seeks summary judgment on the issue of the Supervisors' individual liability for punitive damages.

IV. *CONCLUSION*

For the reasons set forth above, summary judgment will be entered: (1) in favor of all Defendants on all claims asserted by plaintiff Leipziger; (2) in favor of defendant Bergman on all counts; (3) in favor of the Township and Supervisors and against Rob's Automotive on the substantive due process, equal protection, breach of contract and tortious interference with contract claims; (4) in favor of Rob's Automotive and against the Township and the Supervisors on the procedural due process claim; (5) in favor of the Township and against Rob's Automotive on the punitive damages claim; and (6) in favor of the Supervisors and against Rob's Automotive on the punitive damages claim to the extent that it is asserted against the Supervisors in their official capacity. Defendants' motion will be denied to the extent that it seeks summary judgment in favor of the Supervisors, in their individual capacities, on the punitive damages claim. The claims remaining to be litigated are an assessment of compensatory damages against the Township and the Supervisors for the due process violation, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 9

Not Reported in F.Supp.2d, 2001 WL 111611 (E.D.Pa.)

**(Cite as: Not Reported in F.Supp.2d)**

consideration of Rob's Automotive's punitive damages claim against the Supervisors.

An appropriate Order follows.

*ORDER*

AND NOW, TO WIT, this 1st day of February, 2001, upon consideration of defendants the Township of Falls, *et al.*'s Motion to Dismiss Plaintiffs' Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6) or, Alternatively, Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56; plaintiffs Robert Leipziger's and Rob's Automotive & Collision Center, Inc.'s Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56; the memoranda in support of said motions and the responses thereto, IT IS ORDERED that summary judgment is entered:

1. in favor of all defendants on all claims asserted by plaintiff Leipziger;

***11** 2. in favor of defendant Wayne Bergman on all counts;

3. in favor of defendants Township of Falls, Phillip A. Szupka, William Dayton, Richard Otto and James P. Rhein and against Rob's Automotive & Collision Center, Inc. on the substantive due process, equal protection, breach of contract and tortious interference with contract claims;

4. in favor of plaintiff Rob's Automotive and against defendants Township of Falls, Phillip A. Szupka, William Dayton, Richard Otto and James P. Rhein on the procedural due process claim; and

5. in favor of defendant Township of Falls and, to the extent that they are sued in their official capacities, defendants Szupka, Dayton, Otto and Rhein, and against plaintiff Rob's Automotive on the punitive damages claim.

IT IS FURTHER ORDERED that Defendants' motion is DENIED to the extent that it seeks summary judgment in favor of defendants Szupka, Dayton, Otto and Rhein, in their individual capacities, on the punitive damages claim.

E.D.Pa.,2001.
Leipziger v. Township of Falls
Not Reported in F.Supp.2d, 2001 WL 111611 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **HARRIET SAVITCH,** | : | |
| | : | |
| **Plaintiff pro se,** | : | **Case No. 07-215** |
| | : | |
| **vi.** | : | |
| | : | |
| **MARTIN KIRK, individually and in his official capacity as Code Enforcement Officer of the Department of Land Use of New Castle County, and NEW CASTLE COUNTY,** | : | |
| | : | |
| **Defendants.** | : | |

I, Harshal Purohit, Assistant County Attorney, hereby certify that on the 6th day of September, 2007, two copies of the foregoing "Defendants Martin Kirk and New Castle County's Motion for Summary Judgment" was served via U.S. Mail, postage prepaid, to the party at the following address:

Harriet Savitch
16 Woodbrook Circle
Wilmington, DE 19801

/s/ Harshal Purohit
Harshal Purohit, Assistant County Attorney (#4593)
New Castle County Law Department
87 Reads Way
New Castle, DE 19720
(302) 395-5272
*Attorney for New Castle County and Martin Kirk*

Dated: September 6, 2007

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **HARRIET SAVITCH,** | : | |
| | : | |
| **Plaintiff pro se,** | : | **Case No. 07-215** |
| | : | |
| **v.** | : | |
| | : | |
| **MARTIN KIRK, individually and in his official capacity as Code Enforcement Officer of the Department of Land Use of New Castle County, and NEW CASTLE COUNTY,** | : | |
| | : | |
| **Defendants.** | | |

**AFFIDAVIT OF MARTIN KIRK**

STATE OF DELAWARE )
) ss.
COUNTY OF NEW CASTLE )

Martin Kirk, being duly sworn, states:

1. I have been the Community Governing Administrator for New Castle County since September of 2001.

2. On April 22, 2005, I accompanied Officer Solomon on the inspection Harriet Savitch's property located at 16 Woodbrook Circle, Wilmington, DE 19810.

3. On April 22, 2005, Officer Burton and Officer Babinger assisted with the execution of the search warrant on 16 Woodbrook Circle. Attached as Exhibit A is a true and correct copy of Officer Burton's report from April 22, 2005.

4. The April 22, 2005 inspection was conducted pursuant to a search warrant issued by Magistrate Kenny of Justice of the Peace Court No. 1. Attached as Exhibit B is a true and correct copy of the April 22, 2005 search warrant issued by Magistrate Kenny.

5. I made a notation in the case file for 16 Woodbrook Circle, Wilmington, DE 19810. Attached as Exhibit C is a true and correct copy of my notes from the April 22, 2005 inspection of 16 Woodbrook Circle.

6. On April 22, 2005, Harriet Savitch's property located at 16 Woodbrook Circle was posted as "Unfit for Human Habitation". Attached as Exhibit D is a true and correct copy of the April 22, 2005 placard that was posted on the property.

Martin Kirk

SWORN TO AND SUBSCRIBED before me

this 6 day of September 2007

Notary Public

REGINA E. ROARK
NOTARY PUBLIC - STATE OF DELAWARE
MY COMMISSION EXPIRES:
JUNE 28, 2011

**KIRK AFFIDAVIT EXHIBIT A**

001

| Page: | Report Date: | Agency: | Complaint: |
|---|---|---|---|
| 1 | 04/25/2005 | NEW CASTLE COUNTY PD | 32-05-047972 |

Reported Date and Time: FRI 04/22/2005 1050

# Initial Crime Report

Occurred: FRI 04/22/2005 1050

Location: 16 woodbrook CIR Woodbrook Wilmington, DE 19810

M.O. and Incident Overview: Writer assisted New Castle County Code Enforcement with a search warrant execution

| Grid | Sector | County | Domestic Related | 4-F-14 Sent? | Gen Broadcast Sent? | Gang Related? |
|---|---|---|---|---|---|---|
| 120-372 | 12 | New Castle | ☐Yes ☒No | ☐Yes ☒No | ☐Yes ☒No | ☐Yes ☒No |

## Victim Information

| Victim Number | Name |
|---|---|
| 001 | NEW CASTLE COUNTY GOVERNMENT C |

| Type | Sex | Race | Ethnic Origin | Age | D.O.B. |
|---|---|---|---|---|---|
| Government | | | | | |

| Address | Resident Status | Business Telephone | Cell Phone |
|---|---|---|---|
| 87 Reads WAY New Castle, DE 19720 | | (302) 395-5555 | |

| Reporting Person? | Victim Injured? | Victim Deceased? | Officer Comments |
|---|---|---|---|
| ☐Yes ☒No | ☐Yes ☒No | ☐Yes ☒No | |

Injuries | Description of Injuries

## Crimes and Associated Information

| Victim Number | Crime Seq | Statute | Crime Description |
|---|---|---|---|
| 001 | 001 | | Assist Other Agency |

| Location Of Offense | Status | Involvement | General Offense |
|---|---|---|---|
| Residence/Home/Garage | Service Clear 04/22/2005 | ☐Alcohol ☐Drugs ☐Computer | |

| Suspected Hate/Bias | Crime Code |
|---|---|
| ☐Yes ☒No - N/A | 8106 - Assist Other Police Agency |

## Witness Information

| Sequence | Type | Name | Sex | Race | Age | D.O.B. |
|---|---|---|---|---|---|---|
| 001 | Witness | SAVITCH, HARRIET | Female | White | 79 | 09/16/1925 |

| Address | Home Telephone | Cell Phone |
|---|---|---|
| 16 woodbrook CIR Woodbrook Wilmington, DE 19810 | | |

| Sequence | Type | Name | Sex | Race | Age | D.O.B. |
|---|---|---|---|---|---|---|
| 002 | Witness | CUBA, DOCTOR | Male | Asian or Pacific | | |

| Address | Home Telephone | Cell Phone |
|---|---|---|
| 701 Washington ST Wilmington, DE 19801 | (302) 577-2484 | |

| Employer/School | Work Telephone |
|---|---|
| MOBILE CRISIS | |

## Investigative Narrative

On the above date and time, Writer was assigned to assist New Castle County Code enforcement with the execution of a search warrant at 16 Woodbrook Circle. Writer contacted Code Officer's Solomon and Kirk in front of the above address. Writer was advised that the residence had been condemned and that PC-1 (Savitch, Harriet) was living in the residence. Mobile Crisis (Dr. Cuba) was also present to assist in removing Savitch from the residence and transporting her for medical and psychological treatment. Dr. Cuba made contact with Savitch at 1050 hours and she came out of the home at 1105 hours. Writer notes that the residence had every door blocked with piles of clothing and pieces of furniture and that the exterior was overgrown and in disrepair and that Savitch had to exit the residence by a window. Savitch was transported to Wilmington E.R. by Claymont Ambulance at the request of Dr. Cuba. OFC Solomon entered the residence and executed the search warrant at 1105 hours. Writer observed that the interior of the residence had piles of clothing and trash in every room that was three to four feet high. Writer also notes that there was water damage and that the ceiling had collapsed in several rooms in the residence. It appears that Savitch was living in the rear bedroom that she came out of. Writer notes that there was no food or water in the residence and that the trash was causing a foul odor. Code Enforcement declared the residence unfit for habitation and Writer cleared the scene at 1210 with no further action.

| Reporting Officer | Supervisor Approval |
|---|---|
| h BABINGER - 2491 2 | ROBERT C BECKER OJNCRCB Date 04/25/2005 1416 |

Detective Notified | Referred To

| Solvability Factors | | | | | Status |
|---|---|---|---|---|---|
| | ☐Witness | ☐M. O. | ☐Trace Stolen Property | ☐Suspect Named | Closed |
| | ☐Suspect Located | ☐Suspect Described | ☐Suspect Identified | ☐Suspect Vehicle Identified | |

# KIRK AFFIDAVIT EXHIBIT B

**IN THE JUSTICE OF THE PEACE COURT OF THE STATE OF DELAWARE IN AND FOR NEW CASTLE COUNTY**

IN THE MATTER OF: : **IN JUSTICE OF THE PEACE CT.**

**Harriet Savitch W/F DOB 9-16-25** : STATE OF DELAWARE
**16 Woodbrook Circle** : **SEARCH WARRANT**
**Wilmington, DE 19810** :
**Tax Parcel No. 0606800132** :

**State of Delaware** :
: **SS**
**County of New Castle** :

THE STATE OF DELAWARE TO: Code Enforcement Constable Gregory Solomon with the assistance of any police officer or constable or any other necessary or proper person or persons or assistance.

GREETINGS:

Upon the annexed affidavit and application or complaint for a daytime search warrant, as I am satisfied that there is probable cause to believe that certain property located at 16 Woodbrook Circle , Tax Parcel No 0606800132, and owned by Harriet Savitch, is in violation of BOCA Property Maintenance Code Sections 108.1.3 Unfit for Human Occupancy; 303.1 Sanitation; 307.1 Infestation; 703.1 Accumulations and New Castle County Code 6-138(a) , and is being concealed on the property described in the annexed affidavit and application and that search of the premises in the daytime is necessary in order to protect the public welfare and the occupant(s) of the dwelling.

NOW THEREFORE, YOU ARE HEREBY COMMANDED within ten (10) days of the date hereof to search the above named dwelling, house, place, or conveyance for the property specified in the annexed affidavit and application, and to photograph and/or videotape items found in the dwelling, house, place, or conveyance above-named dwelling that may be the fruits or instrumentalities of a crime.

This warrant should be served no later than 10:00 P.M. on , 200 and shall be executed only during the DAYTIME hours

ISSUED UNDER MY HAND THIS 22 day of Apr, 2005, at 10:20 A.M./P.M. o'clock.

Justice of the Peace
Justice of the Peace Court No.

# KIRK AFFIDAVIT EXHIBIT C

ᴱW CASTLE COUNTY
87 Reads Way
New Castle, DE 19720
(302)395-5555 Fax (302)395-5545

**HWE Case**

**Report Date** 04/23/2007 01:49 PM **Submitted By** 

| Inspections Insp # | Insp Type Preference | # | Ord/Grp Inspected By | Assigned To Comments | Call | Scheduled |
|---|---|---|---|---|---|---|
| 753542 5710 | CE INSPECT | 40 | 0 | 5710 | | 04/13/2007 00:00 |
| 456650 | CE INSPECT | 1 | 0 8295 | 8295 On 03/02/04 **F.I.** Writer responded and observed the following violations that exist at said property, (2) unregistered/inoperable vehicles P/C #DE 168602 Exp 6/03 Gold Mercury Sable and #DE234909 Exp 6/03 White Chrysler Sebrine with trash stored in both vehicles DIRECTIVE: Within (7)days properly register or remove any/all unregistered and/or inoperable vehicles including but not limited to above mentioned and maintain property free from at all times. Openly storage of household items in the front of garage and in driveway i.e. bags and boxes of clothes,(1)television, (1)chair, golf clubs and medical walkers including but not limited to above mentioned. DIRECTIVE:Within (5)days Properly remove any/all openly stored household items including but not limited to above mentioned and maintain property free from at all times. Writer observed overflowing trash cans that had plastic bottles, bags and boxes of trash, soda cans. DIRECTIVE:Within (5)days properly remove any/all accummalation of trash, including but not limited to above mentioned and maintain property free from at all times. Flaking and peeling paint on the fasica trim, underneath overhang and exterior walls, DIRECTIVE: Within (21)days properly scrape and repaint any/all flaking and peeling paint surfaces, including but not limited to above mentioned and maintain property free from at all times.Writer observed shed in rear of property that is in disrepair-roof falling in. DIRECTIVE: Properly remove or repair any/a | | 03/04/2004 15:45 |
| 457161 | CE INSPECT | 2 | 0 8295 | 8295 cont'd - exterior roof of shed located in the rear of property that is falling in , including but not limited to above mentioned and maintain property free from at all times Within (21)days | | 03/08/2004 07:32 |
| 495597 5972 | CE INSPECT | 3 | 0 8295 | 8295 Re-inspection of the property revealed that little if anything was done. CEO observed trash, debris and household items openly stored on the property (t.v., chair, clothes in torn bags, accumulation of openly stored torn bags with trash in them. Inspection revealed that the white Chrysler Sebring, DE 234909 with heavy front end damage, was still on the property. Pictures were taken and charges will be filed. | | 11/08/2004 11:37 |
| 526918 5710 | CE INSPECT | 4 | 0 8169 | 8295 Greg Solomon and Marty Kirk observed from the neighboring property that the pool in the back yard is full of trash bags. All the doors and windows that could be observed appeared to be completely blocked with trash. The outside has numerous bags of trash all torn open and ripped apart by animals. The roof has large holes in it that the neighbor state have racoons going in through them. | | 05/09/2005 00:00 |
| 575448 8169 | CE INSPECT | 5 | 0 8169 | 8295 Greg Solomon got a Search Warrant for this property. Marty Kirk called Mobile Crisis and County Police and asked that they meeting up at the property. The doctor and his assistant's from Mobile Crisis spoke with Mrs. Savitch and convinced her to come outside, they called an ambulance to take her to the hospital for evaluation. Greg issued the search warrant to Mrs. Savitch prior to her going away. Gregg,Marty and Police Officer Babinger entered the property. Upon entry, which had to be done through the window that Mrs. Savitch came out, we found the entire property to loaded with about 3 feet of trash and misc items. In a couple of rooms the ceilings had collapsed and the dry wall and attic insulation was laying on top of the accumulated debris. | | 04/22/2005 14:16 |
| 575457 8169 | CE INSPECT | 6 | 0 8295 | 8295 A vendor has cleaned the debris from the exterior. ON 04/22/05 WRITER RESPONDED AND OBSERVED THAT PROPERTY WAS POSTED UNFIT AND UNSECURED, PICTURES WERE TAKEN AND VENDOR CONTACTED TO REMOVE OUTSIDE DEBRIS,I.E. IN FRONT OF GARAGE AND IN THE REAR YARD AROUND POOL AREA. | | 05/09/2005 14:29 |

# KIRK AFFIDAVIT EXHIBIT D

# This Structure is

# UNFIT FOR HUMAN HABITATION

## And it's Occupancy has been Prohibited by the Code Official

## New Castle County
## Department of Land Use – Code Enforcement

THE CODE OFFICIAL CONSIDERS THIS STRUCTURE CONDEMNED. REMOVAL OF THIS PLACARD WITHOUT THE APPROVAL OF THE CODE OFFICIAL IS A CRIMINAL VIOLATION. ENTRY INTO THIS STRUCTURE WITHOUT THE APPROVAL OF THE CODE OFFICIAL IS A CRIMINAL VIOLATION. QUESTIONS SHOULD BE DIRECTED TO THE OFFICE OF CODE ENFORCEMENT AT 302-395-5555.

Owner: HARRIET, SAVITCH

Address of Violation / Tax Parcel No: 16 WOODBrook Circle #0606800132

22nd April 2005 @ 13:00 Hrs

Time and Date Posted

GREGory SOLOMON

Code Official

## This Structure is

# UNSAFE

## And it's Occupancy has been Prohibited by the Code Official

## New Castle County
## Department of Land Use – Code Enforcement

THE CODE OFFICIAL CONSIDERS THIS STRUCTURE CONDEMNED. REMOVAL OF THIS PLACARD WITHOUT THE APPROVAL OF THE CODE OFFICIAL IS A CRIMINAL VIOLATION. ENTRY INTO THIS STRUCTURE WITHOUT THE APPROVAL OF THE CODE OFFICIAL IS A CRIMINAL VIOLATION. QUESTIONS SHOULD BE DIRECTED TO THE OFFICE OF CODE ENFORCEMENT AT 302-395-5555.

Owner: HARRIET, SAVITCH #0606800132

Address of Violation / Tax Parcel No: 16 WOODBROOK Circle

22ND APRIL 2005 @ 1300 HRS
Time and Date Posted

GREGORY SOLOMON
Code Official